JOANNE LAW *vs.* DANIEL GRIFFITH.

Middlesex. December 9, 2009. - July 20, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Evidence,* Medical bill, Medical expenses. *Negligence.*

In a negligence action, a judge in the Superior Court erred in excluding from
   evidence the plaintiff's medical bills, where G. L. c. 233, § 79G, unambigu-
   ously permits the introduction of such bills as evidence of the reasonable
   value of the services rendered when the services are related to the injury
   for which the claim is made. [352-353]
This court, taking into consideration both G. L. c. 233, § 79G, and the common-
   law collateral source rule, concluded that in a negligence action, evidence
   of amounts actually paid to a plaintiff's medical providers is not admis-
   sible, but evidence may be introduced concerning the range of payments
   that such providers accept for the types of medical services that the plaintiff
   received. [353-361] COWIN, J., concurring, with whom IRELAND and SPINA,
   JJ., joined.

CIVIL ACTION commenced in the Superior Court Department on
July 31, 2003.

The case was tried before *Hiller B. Zobel,* J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Kathy Jo Cook* for the plaintiff.

*Ralph C. Sullivan* for the defendant.

The following submitted briefs for amici curiae:

*Andre A. Sansoucy & Michael J. Mazurczak* for Property
Casualty Insurers Association of America & another.

*Mary Jane McKenna, J. Michael Conley, & Michael C. Naj-
jar* for Massachusetts Academy of Trial Attorneys.

*Emily G. Coughlin & Kevin J. O'Leary* for Massachusetts
Defense Lawyers Association.

BOTSFORD, J. General Laws c. 233, § 79G (§ 79G), concerns,
in part, the admissibility of medical bills "as evidence of the

fair and reasonable charge" for medical services provided.[1] In this negligence action in which the plaintiff sought to recover damages for personal injuries, a Superior Court judge determined that the plaintiff's medical bills could be excluded from evidence under § 79G because the amounts actually paid by the plaintiff's medical insurer, and accepted by her medical providers, were significantly lower than the amounts the providers had billed. We conclude that the statute does not authorize exclusion of such evidence. However, we conclude further that evidence concerning the possibility of payments made by third parties, and the range of payments accepted by medical providers as payment in full, is also admissible under § 79G on the question of the reasonable charge for and value of those medical services.[2]

1. *Background and prior proceedings.* The plaintiff was injured in an automobile accident when the defendant's vehicle struck her vehicle. The plaintiff's injuries required surgery and physical therapy. Subsequently, she filed a negligence action in the Superior Court.

Pursuant to § 79G, the plaintiff filed, prior to trial, a notice of her intention to offer copies of her medical bills in evidence. The defendant filed a motion in limine to exclude those bills (totaling $112,269.94) from evidence because the plaintiff, a participant in MassHealth, the Massachusetts Medicaid program (Medicaid),[3] had not paid the amounts billed. Rather, the plaintiff's medical providers had accepted from Medicaid

[1]General Laws c. 233, § 79G (§ 79G), provides in part: "In any proceeding commenced in any court, commission or agency, an itemized bill and reports, including hospital medical records, relating to medical, dental, hospital services, prescriptions, or orthopedic appliances rendered to or prescribed for a person injured, or any report of any examination of said injured person . . . shall be admissible as evidence of the fair and reasonable charge for such services or the necessity of such services or treatments . . . ."

[2]We acknowledge the amicus briefs submitted by the Massachusetts Academy of Trial Attorneys; the Massachusetts Defense Lawyers Association; and jointly by the Property Casualty Insurers Association of America and the National Association of Mutual Insurance Companies.

[3]Medicaid is a program established under Title XIX of the Social Security Act and is designed to pay for health care for low income persons. See 42 U.S.C. §§ 1396a et seq. (2006). Primary oversight of Medicaid is handled at the Federal level, but each State establishes its own eligibility standards, determines the type, amount, duration, and scope of services, and administers its own Medicaid program. See 42 U.S.C. § 1396a. Both Federal and State

substantially smaller amounts as negotiated under the terms of the providers' agreements with Medicaid. A Superior Court judge allowed the defendant's motion on the ground that the bills were not relevant to establish the value of the medical services the plaintiff had received because those amounts had not been paid, and were not expected to be paid, by either the plaintiff or her insurer. Following the judge's decision, the parties stipulated that $16,387.14 for medical services had been paid by the plaintiff or on her behalf, and this stipulation was introduced at trial.

The jury determined that the defendant was seventy-five per cent liable for the plaintiff's injuries and, in a general verdict, awarded the plaintiff $48,500. The judge reduced that award by $12,125 to account for the plaintiff's twenty-five per cent responsibility for her injuries. See G. L. c. 231, § 85. After further reductions for the amount of personal injury benefits ($7,818.50) that the plaintiff had already received, judgment entered for the plaintiff in the amount of $28,556.50.

The plaintiff appealed from the jury's award of damages, challenging the trial judge's exclusion of her medical bills.[4] In a decision issued pursuant to its rule 1:28, the Appeals Court determined that the judge erred in declining to admit the medical bills as evidence of the value of the plaintiff's medical services and, therefore, that a new trial on damages was required. *Law* v. *Griffith*, 73 Mass. App. Ct. 1127 (2009). We granted the defendant's application for further appellate review.

2. *Discussion.* Our established common-law rule provides that a plaintiff injured by a defendant's negligence is entitled to recover the value of reasonable medical services required to treat the injury. See *Scott* v. *Garfield*, 454 Mass. 790, 800 (2009), quoting *Rodgers* v. *Boynton*, 315 Mass. 279, 280 (1943). The

sources fund each State program. 42 U.S.C. § 1396a(a)(2). In Massachusetts, the Medicaid program is called MassHealth. See G. L. c. 118E, §§ 9 et seq.; 130 Code Mass. Regs. §§ 501.000-522.000 (2010). For ease of reference, however, we refer to the Massachusetts program as Medicaid in this opinion. Providers who accept MassHealth (Medicaid) patients must agree to accept only the amounts that Medicaid will reimburse for services rendered, according to an established schedule, and may not seek additional contribution from the recipient. 130 Code Mass. Regs. §§ 450.000 (2009). See generally 130 Code Mass. Regs. §§ 400.000-499.000, 501.000-522.000 (2010).

[4]Neither party appealed from the liability portion of the judgment.

plaintiff argues that the language of § 79G mandates the admission of the bills she received from her medical providers as evidence of the reasonable and necessary value of the medical services rendered; the judge erred in declining to allow her to introduce those bills; and the judge's decision to allow evidence of the amounts paid was error because the introduction of evidence of Medicaid "write-offs"[5] was a violation of the collateral source rule. The defendant asserts that the judge decided correctly that the amounts billed were not relevant, and therefore not admissible, because those amounts were not paid, nor expected to be paid, by the plaintiff or her insurer.

a. *Admission of amounts billed under § 79G.* Pursuant to § 79G, itemized medical bills, "including hospital medical records, relating to medical, dental, hospital services, prescriptions, or orthopedic appliances rendered to or prescribed for a person injured, or any report of any examination of said injured person, . . . shall be admissible as evidence of the fair and reasonable charge for such services or the necessity of such services or treatments." The statute creates an exception to the hearsay rule, see, e.g., *Phelps* v. *MacIntyre*, 397 Mass. 459, 462 (1986); *O'Malley* v. *Soske*, 76 Mass. App. Ct. 495, 497-498 (2010), and, as it states, permits the introduction in evidence of itemized medical bills for two distinct purposes: to serve in the calculation of damages as evidence of the reasonable value of the services incurred, see *Victum* v. *Martin*, 367 Mass. 404, 408 (1975), and to show the necessity of the medical services provided. See *id.* at 408-410; *Gompers* v. *Finnell*, 35 Mass. App. Ct. 91, 93-94 (1993).

A statute is to be interpreted "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Triplett* v. *Oxford*, 439 Mass. 720, 723 (2003),

---

[5]A "write-off" is the difference between the original amount billed by a medical provider and the amount the provider agrees to accept as payment in full for the services provided. See *Robinson* v. *Bates*, 112 Ohio St. 3d 17, 20 (2006).

quoting *Board of Educ.* v. *Assessor of Worcester,* 368 Mass. 511, 513 (1975). "Ordinarily, if the language of a statute is plain and unambiguous it is conclusive as to legislative intent." *Sterilite Corp.* v. *Continental Cas. Co.,* 397 Mass. 837, 839 (1986), citing *Local 589, Amalgamated Transit Union* v. *Massachusetts Bay Transp. Auth.,* 392 Mass. 407, 415 (1984). Where, as here, the language of the statute is clear, it must be interpreted according to the ordinary meaning of the language used. See, e.g., *Milford* v. *Boyd,* 434 Mass. 754, 756 (2001).

Section 79G states unambiguously that medical bills are admissible to establish the reasonable value of services rendered where the services are related to the injury for which the claim is made. The plaintiff signed a routinely required contract with her providers at the time services were rendered in which she agreed that she would be personally liable for the costs of treatment regardless whether her insurer paid for any portion of it. Although the agreement was ultimately unenforceable in the plaintiff's case because she was a Medicaid recipient and the agreement was preempted by the requirements of the Medicaid program (see note 3, *supra*), in other circumstances, injured parties could be liable under the terms of such agreements. In any event, the Legislature has declared that a medical provider's bill is admissible on the question of the reasonable value of medical care, and we are not free to override that lawful determination. The judge's ruling that the plaintiff's medical bills were inadmissible was error.

b. *Admission of evidence of amounts paid to medical providers.* Having concluded that § 79G required the admission of the plaintiff's medical bills, we must decide whether the defendant's proffered evidence of the amounts paid to the plaintiff's medical providers was admissible as well — that is, in addition to her medical bills rather than in lieu of them. The answer to this question requires consideration of § 79G as well as our common-law collateral source rule. We briefly review each of these sources separately, and then discuss them together. We conclude that evidence of amounts actually paid to the plaintiff's medical providers is not admissible, but evidence may be introduced concerning the range of payments that the providers accept for the types of medical services that the plaintiff received.

(i) *Section 79G.* The first paragraph of § 79G has two sentences, and they read in pertinent part as follows:

"[1] In any proceeding commenced in any court . . . an itemized bill and reports, including hospital medical records, relating to medical, dental, hospital services, prescriptions, or orthopedic appliances rendered to or prescribed for a person injured . . . subscribed and sworn to under the penalties of perjury by the physician, dentist, authorized agent of a hospital or health maintenance organization rendering such services or by the pharmacist or retailer of orthopedic appliances, shall be admissible as evidence of the fair and reasonable charge for such services or the necessity of such services or treatments . . . . [2] Nothing contained in this section shall be construed to limit the right of any party to the action to summon, at his own expense, such physician, dentist, pharmacist, retailer of orthopedic appliances or agent of such hospital or health maintenance organization or the records of such hospital or health maintenance organization for the purpose of cross examination with respect to such bill, record and report or to rebut the contents thereof, or for any other purpose, nor to limit the right of any party to the action or proceeding to summon any other person to testify in respect to such bill, record or report or for any other purpose."

Since its enactment in 1958, see St. 1958, c. 323, § 79G has contained the language in its first sentence providing explicitly for the admission in evidence of certified records of medical bills "as evidence of the fair and reasonable charge for such services."[6] The second sentence of § 79G, however, clearly bears on the issue of fair and reasonable charges as well. It affirms, in general terms, the right of any party to call witnesses and to summons other medical records for purposes of conducting cross-examination and offering rebuttal evidence with respect to the plaintiff's proffered medical bills.

(ii) *Collateral source rule.* Under the common-law collateral

---

[6]Thus, since its inception, § 79G has referenced and supported the standard of medical damages embodied in our common-law tort principles, namely, that a plaintiff is entitled to recover the value of reasonable medical expenses incurred for the necessary treatment of her injury. See *Scott* v. *Garfield*, 454 Mass. 790, 800 (2009); *Rodgers* v. *Boynton*, 315 Mass. 279, 280 (1943).

source rule, the value of reasonable medical expenses that an injured plaintiff would be entitled to recover from the tortfeasor as a component of her compensatory damages, see *Rodgers* v. *Boynton*, 315 Mass. 279, 280 (1943), is not to be reduced by any insurance payments or other compensation received from third parties by or on behalf of the injured person. See *Goldstein* v. *Gontarz*, 364 Mass. 800, 808-809 (1974), and cases cited; Restatement (Second) of Torts § 920A (1979).[7] See also *Jones* v. *Wayland*, 374 Mass. 249, 262 (1978). In terms of operation, the collateral source rule has both a substantive aspect that relates to the law of damages, and an evidentiary component that governs what types of evidence may be admitted in evidence at trial. See *Goldstein* v. *Gontarz*, *supra* at 809 (information about plaintiff's receipt of insurance or other compensation for his injury is legally irrelevant because, under collateral source rule, "outside source" compensation does not reduce defendant's liability; evidence of such compensation not admissible because "jurors might be led by the irrelevancy" to reduce or deny recovery). See also *Scott* v. *Garfield*, 454 Mass. at 803 (Cordy, J., concurring), citing *Leitinger* v. *DBart, Inc.*, 302 Wis. 2d 110, 149-150 (2007).

The purpose of the collateral source rule is tort deterrence. The tortfeasor is required to compensate the injured party for the fair value of the harm caused, and is not to benefit from either contractual arrangements of the injured party with insurers or from any gifts from others intended for the injured party. See *Jones* v. *Wayland*, *supra*; *Goldstein* v. *Gontarz*, 364 Mass. at 809-810. See also *Shea* v. *Rettie*, 287 Mass. 454, 457-458 (1934) (disability insurance payments received by tort plaintiffs could not be considered as offset against plaintiffs' claims for loss of earning capacity). According to the collateral source rule, avoiding a windfall to a tortfeasor is preferable even if a plaintiff thereby receives an excessive recovery in some circumstances. See Restatement (Second) of Torts, *supra* at § 920A comment b (excluding both "payments made" and "benefits conferred by

---

[7]The collateral source rule, as described in the Restatement (Second) of Torts § 920A (1979), provides: "Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable."

other sources" from amounts that may be subtracted from plaintiff's recovery, because "it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor"). Comment c to § 920A identifies a number of "collateral benefits," including insurance policies; employment benefits, such as workers' compensation; "[g]ratuities," whether cash or "rendering of services"; and "[s]ocial legislation benefits," such as "welfare payments" or pensions.

(iii) *Section 79G and the collateral source rule.* The collateral source rule has traditionally operated in conjunction with § 79G with little or no indication of conflict. A recent case, however, reflects the possibility of growing tension between them. See *Scott* v. *Garfield,* 454 Mass. at 801 n.11. In that case, the defendants sought to introduce in evidence the amounts actually paid to and accepted as payment in full by the plaintiff's medical providers — amounts substantially below the providers' bills. We stated in dictum, however, that the trial judge properly excluded the evidence as violative of the collateral source rule. *Id.* at 801.[8] See *Wills* v. *Foster,* 229 Ill. 2d 393, 419-420 (2008) (plaintiff entitled to recover reasonable value of medical services regardless of whether plaintiff has private insurance or is covered by government program; defendant was not permitted to introduce in evidence amount paid by Medicare or Medicaid, as such evidence would violate collateral source rule, and plaintiff's recovery was not limited to amount actually paid by Medicare or Medicaid in full settlement of bills).

Whether, as *Scott* v. *Garfield* suggests, the collateral source rule should limit the types of rebuttal evidence admissible under the second sentence of § 79G is a significant question, because, at the present time, medical bills admissible under the first sentence of § 79G may bear little relationship to the "fair and reasonable" value of medical services rendered. See *Scott* v. *Garfield, supra* at 803 (Cordy, J., concurring). With the increasing role played by public and private health insurers in the

---

[8]The statement was dictum because the defendants had "made no evidentiary proffer, i.e., a showing that the health care providers had agreed to accept as full payment some amount less than the amount billed, that would have laid the foundation for such a challenge to the application of the collateral source rule." *Scott* v. *Garfield,* 454 Mass. at 801. See *id.* at 802-803 (Cordy, J., concurring).

American health care delivery system, doctors, hospitals, and other medical care providers have developed charge structures that may have little or no relationship to the reasonable value of the medical services at issue, because the providers ultimately negotiate discounts from the listed charges and are reimbursed on the basis of the discounted rates. The only patients actually paying the stated charges are the uninsured, a small fraction of medical bill payors. See Hall, Patients as Consumers: Courts, Contracts, and the New Medical Marketplace, 106 Mich. L. Rev. 643, 661-663 (2008);[9] McGrath, Overcharging the Uninsured in Hospitals: Shifting a Greater Share of Uncompensated Medical Care Costs to the Federal Government, 26 Quinnipiac L. Rev. 173, 184-185 (2007) ("The evolution of the nation's health care payment systems . . . has evolved into a system where a hospital's list price is relatively meaningless").[10]

At the same time, the actual amounts paid by an insurer to

[9]The authors relate:

"[T]he differences between what doctors charge insured and uninsured patients are eye-popping. For example, one study calculated that physicians overall charge 79% more than they receive from insurers. Differentials vary. For basic office or hospital visits, primary-care physicians typically charge one-third to one-half more than they receive from insurers (i.e., insurers get discounts of 25%-33%). Markups are substantially higher for high-tech tests and specialists' invasive procedures. Across a range of specialty services . . . physicians charge roughly two to two-and-a-half times what insurers pay. In contrast, before aggressive managed care discounts, physicians' markups over Medicare and private insurance were roughly 25%-50% for both primary care and specialty procedures. . . .

"In 1960, '[t]here were no discounts; everyone paid the same rates' — usually cost plus ten percent. But as some insurers demanded deep discounting, hospitals vigorously shifted costs to patients with less clout. . . .

"Insurers pay [for hospital-based services] about forty cents per dollar of listed charges. Thus hospitals bill uninsured patients 250% more than insured patients. This disparity has exploded over the past decade: since the early 1990s, list prices have increased almost three times more than costs, and markups over costs have more than doubled, from 74% to 164%."

Hall, Patients as Consumers: Courts, Contracts, and the New Medical Marketplace, 106 Mich. L. Rev. 643, 662-663 (2008).

[10]See also *Stanley* v. *Walker*, 906 N.E.2d 852, 857 (Ind. 2009) ("The

the provider may confound rather than mitigate the problems posed by medical bills, because the amounts paid, like the bills or charges themselves, may not have more than a tenuous relationship to the reasonable value of the provider's medical services. This is so because the discount from charges that the provider accepts is likely a function of a variety of factors, including the bargaining power of the insurer, or, as here, limited by Federal or State law — factors that relate to the injured plaintiff's relationship with a collateral third-party payor and have nothing to do with the tortfeasor. But admission of these amounts, precisely because they reflect what was paid and accepted by the plaintiff's medical providers for the services rendered, may well lead a jury to award the plaintiff exactly that amount for medical damages or, perhaps, no medical damages at all in the belief that the plaintiff did not pay the expenses herself but relied on insurance or another third party to do so. Such a result would run counter to the collateral source rule. Perhaps more importantly, if, for the reasons just stated, the amounts paid do not correspond to the reasonable value of the medical services at issue, such a result would also contravene our established common-law rule of medical damages that has been adopted by and codified in § 79G.[11]

Many States have modified the traditional collateral source

complexities of health care pricing structures make it difficult to determine whether the amount paid, the amount billed, or an amount in between represents the reasonable value of medical services"); *Robinson* v. *Bates*, 112 Ohio St. 3d 17, 23 (2006) (suggesting same view). See generally *Scott* v. *Garfield*, 454 Mass. at 803-805 (Cordy, J., concurring).

[11]Furthermore, admitting in evidence the amounts paid to and accepted by the plaintiff's providers may create different classes of plaintiffs based "on the relative fortuity of the manner in which each plaintiff's medical expenses are financed." *Leitinger* v. *DBart, Inc.*, 302 Wis. 2d 110, 128 (2007). See *Wills* v. *Foster*, 229 Ill. 2d 393, 407, 413-414 (2008). The potential for unequal treatment of plaintiff classes may be particularly pronounced for those individual plaintiffs, like the plaintiff in this case, whose medical expenses are covered by a federally regulated program such as Medicare or Medicaid. See Note, Profiting Under the Veil of Compensation: *Wills* v. *Foster* and the Application of the Collateral Source Rule to Medicare and Medicaid, 58 DePaul L. Rev. 789, 825 (2009) ("Distinguishing Medicare and Medicaid benefits from those derived from private insurance agreements ultimately leads to line drawing that unfairly distinguishes between plaintiffs"); Comment, Improperly Divorced from Its Roots: The Rationales of the Collateral Source Rule and Their Implications for Medicare and Medicaid Write-Offs, 55 U. Kan. L. Rev. 463, 490-495 (2007).

rule in the last twenty-five years, generally through legislative action. See Benjet, A Review of State Law Modifying the Collateral Source Rule: Seeking Greater Fairness in Economic Damages Awards, 76 Def. Couns. J. 210, 211 (2009) (fifty State survey; forty-two jurisdictions effected modifications by legislation rather than court decision). Following this trend, the Legislature has modified our collateral source rule, but only with respect to awards of medical damages in medical malpractice cases. See G. L. c. 231, § 60G, inserted by St. 1986, c. 351, § 25 (establishing postverdict procedure for reduction of awards of medical damages by judge through introduction of evidence of insurance payments and costs of obtaining insurance benefits). The Legislature's enactment of this narrowly tailored restriction to the common-law collateral source rule certainly reflects legislative awareness of the rule, but it also may indicate a determination that the common-law rule should continue to operate without alteration in connection with awards of medical damages outside of the medical malpractice arena — that is, in the types of cases covered by § 79G.

The Legislature's enactment of G. L. c. 231, § 60G, while leaving the relevant provisions of § 79G unchanged, persuades us that we should leave any further modifications of the collateral source rule's application to the Legislature. See Restatement (Second) of Torts § 920A comment d (1979) (noting collateral source rule "is of common law origin and can be changed by statute"). Cf. *Kerins* v. *Lima*, 425 Mass. 108, 110 (1997), quoting *Commercial Wharf E. Condominium Ass'n* v. *Waterfront Parking Corp.*, 407 Mass. 123, 129 (1990), *S.C.*, 412 Mass. 309 (1992) (court will not presume Legislature intended "radical change in the common law without a clear expression of such intent"). Consistent with this view of the Legislature's role, but also in recognition of the fact that the system for setting (and paying for) charges for medical services has changed dramatically since § 79G was enacted in 1958, the challenge is to give effect to the second sentence of § 79G in a manner that supports the section's over-all focus on "fair and reasonable" medical expenses but also protects the core of the collateral source rule.

Although the first sentence of § 79G is very specific in its

directive that medical bills are admissible in evidence, the second sentence uses more general language, authorizing the summoning of witnesses or records without delineating in any manner the permissible scope of the witnesses' testimony or the use of the records. In the circumstances, we conclude that a reasonable way to implement the second sentence of § 79G is to permit the defendant[12] to call a representative of the particular medical provider whose bill the defendant wishes to challenge, and to elicit evidence concerning the provider's stated charges and the range of payments that that provider accepts for the particular type or types of services the plaintiff received. In this context, it would appear appropriate for the witness to acknowledge that the range of payments being testified to reflects amounts paid by both individual, self-paying patients and third-party payors; certainly jurors are aware that health insurance is a present day reality, particularly in the Commonwealth.[13] See G. L. c. 111M, § 2 (*a*) (establishing mandatory health insurance coverage). But the witness would not be permitted to identify the plaintiff's insurer or third-party payor, or to testify to the amount actually paid on the plaintiff's behalf.[14] In other words, the witness would be limited to testimony solely about the *amounts* in the range that the provider accepted for the services at issue, with no information relating to what was paid by or on behalf of the plaintiff herself.[15] With its emphasis on range of payments, such evidence could assist the jury in identifying — as § 79G indicates should be done — what might be a fair and reasonable charge

---

[12]By its terms, the second sentence of § 79G applies to "any party," not just a defendant. We refer solely to "the defendant" for ease of reference.

[13]In a jury trial, the judge should deal with the issue of insurance in his or her instructions. We discuss this point, *infra.*

[14]Similarly, any written evidence indicating the amounts paid on behalf of the plaintiff would not be admissible.

[15]In addition to calling a representative of the provider, as the last portion of the second sentence of § 79G provides, the defendant might also call an expert witness to testify generally about, for example, current hospital or other medical provider billing practices and the system of discounting those charges. An expert might also offer opinion testimony about the general relationship between charges and reasonable value, or discounted payments and reasonable value. Again, the only limitation would be that such a witness could not be asked to opine whether any amount actually paid on behalf of the plaintiff was a reasonable charge or reasonable reflection of the value of the services rendered.

for the services at issue.[16] At the same time, the evidence would not undermine the collateral source rule, because it would not touch in any manner on whether, or in what amount, collateral third parties (whether a private insurance company, Medicare, or Medicaid) had paid for the medical treatment the plaintiff received.

(iv) *Jury instructions.* Jury instructions may need to be modified to be consistent with this opinion. For example, it would be appropriate to include an instruction that acknowledges the existence and widespread use of medical insurance, but explains that whether the plaintiff's medical expenses were paid by her, covered by insurance, or otherwise paid on her behalf, is not relevant to the jury's task, namely, to determine the fair and reasonable value of the necessary medical services that were provided, as well as of any medical services that are likely to be necessary in the future. With respect to giving specific guidance on how to determine "fair and reasonable" value, we defer to the trial judges who are dealing with a particular case and particular set of facts, to fashion an appropriate instruction.[17]

3. *Conclusion.* The judgment of the Superior Court is reversed and the case is remanded for a new trial on the issue of damages.

*So ordered.*

Cowin, J. (concurring, with whom Ireland and Spina, JJ., join). General Laws c. 233, § 79G, sets forth a straightforward

---

[16]We do not reach the question whether an uninsured, self-paying patient would be permitted to introduce evidence of his or her full payment of the provider's stated charges.

[17]The concurrence suggests that we create here an overly complicated regime and offer little or no guidance to jurors about how to navigate it in order to determine what the fair or reasonable value of medical services might be. *Post* at 365 (Cowin, J., concurring). But in light of the reality that the amounts actually paid by or on behalf of a plaintiff for medical services may not reflect the reasonable value of those services any more than the medical bills do, the jury are not likely to receive any greater guidance on the critical issue of fair and reasonable value from admission of evidence concerning the paid amounts. At the same time, as we have stated, because such evidence provides concrete dollar figures that correspond to what was actually paid, its admission offers the jury a temptingly easy, albeit legally misleading, path to follow in arriving at an award of medical damages.

rule of evidence designed to facilitate the proof of "the fair and reasonable charge for [various medical] services or the necessity of such services or treatments." It does so by creating an exception to the hearsay rule in order to permit the admission of sworn bills and reports, thereby eliminating the requirement that a provider appear in person to testify. However, because the provider is not present and because other evidence on the subject may be meaningful, the statute provides further that such bills and reports are not to be treated as the only competent evidence, and parties retain the right to introduce other types of evidence as well.

The court today rules correctly that, by virtue of this statute, the Legislature has declared that a bill for medical services otherwise in conformance with the statute shall be admissible on the question of the reasonable value of medical care, and that the judge was not free to override that lawful legislative determination. Unfortunately, the court then proceeds to characterize the first sentence of the statute as "very specific in its directive," while minimizing the seemingly similar second sentence as "general" and not "delineating in any manner the permissible scope" of the evidence. *Ante* at 359-360. It then employs this questionable distinction to impress on the second part of the statute a policy-laden, murky construction that will be difficult, time-consuming, and expensive to apply, and that well may lead to inaccurate verdicts.

As the court admits, we have construed the second section of the statute to be confined by the so-called collateral source rule, a common-law rule of both substance and evidence that provides that recoveries in tort cases shall not be reduced by insurance payments or other benefits that the plaintiff receives from third parties. See *Goldstein* v. *Gontarz*, 364 Mass. 800, 808-809 (1974); Restatement (Second) of Torts § 920A (1979). Thus, we have for some time effectively amended the statute by imposing a judge-made restriction on the type of evidence that may be admitted thereunder. The statute itself contains no such limitation and makes no reference to the considerations underlying the collateral source rule.

For some time, this made little practical difference. Section 79G, inserted by St. 1958, c. 323, was adopted at a time when medical bills ordinarily reflected with reasonable accuracy the

value of the medical services provided. This is no longer the case. The judge may, because of the statute, have erred in excluding the bill in this case, but he was plainly correct in concluding that medical bills on the whole have ceased to be a reliable measure of the value of particular services rendered to particular patients. The funding of medical services is now organized largely on the basis of private and public third-party payments. Large disparities often exist between the amounts billed by providers and the amounts that those providers are willing to accept as full payment from various insurers. Nor, contrary to the court's concern with uninsured and publicly assisted plaintiffs, is the problem limited to such persons. Medical bills rendered to the affluent, as well as to the poor, often reflect costs, such as overhead, capital investment, research and development, and the subsidizing of other medical procedures, that are unrelated to the value of the specific services performed.

For these reasons, the collateral source rule has become an anachronism when applied to the valuation of medical services. Perhaps not the only, but certainly the principal, measure of the value of any goods or services is what a purchaser is willing to pay for them. The fact that the purchaser is the government or a private insurer does not alter that proposition. Given the realities of medical insurance and medical billing practices as they exist today, where large disparities can exist between the amounts billed by providers and the amounts that such providers are willing to accept as full payment, strict adherence to the collateral source rule distorts, rather than clarifies, the subject for jury consumption.

The court's decision demonstrates that it recognizes the problem, but also that it shrinks from the most workable solution. Thus, the court concludes that "evidence may be introduced concerning the range of payments that the providers accept for the types of medical services that the plaintiff received," but clings to the traditional view that "evidence of amounts actually paid to the plaintiff's medical providers is not admissible." *Ante* at 353. Passing the fact that it conflicts with § 79G (which appears to accommodate no restrictions on the use of otherwise admissible evidence), the decision represents a partial relaxation of the collateral source rule followed by a concession that "we should

leave any further modifications of the collateral source rule's application to the Legislature." *Ante* at 359. The common-law collateral source rule, a judicial creation in the first place, can be revised, or even eliminated, by the judicial branch. In the alternative, we can await meaningful legislative enactment. The court, motivated in part by questionable policy concerns, seeks to do both, arriving at a nervous compromise that will be difficult to implement and that is unlikely to bring us closer to achievement of the central objective, i.e., to enable the plaintiff to recover reasonable medical expenses incurred for the necessary treatment of his or her injury. See *Scott* v. *Garfield*, 454 Mass. 790, 800 (2009).

The court's rejection of an interpretation of § 79G that would admit evidence of what was actually paid in a given case reflects its suspicion that the use of such evidence will create different classes of plaintiffs based on how medical care is financed. More specifically, the court expresses concern that "[t]he potential for unequal treatment of plaintiff classes may be particularly pronounced for those individual plaintiffs . . . whose medical expenses are covered by [a Medicaid program such as Mass-Health]." *Ante* at note 11. It follows, according to the court, that, once a jury know that medical expenses have been paid by a third party, that jury will award only the amount of the payment, or even no medical damages at all (on the theory that the plaintiff has incurred no out-of-pocket loss). Implicit in these statements is a concern that jurors will effectuate a prejudice against publicly assisted (i.e., poor) people by reducing medical expense recoveries for that class.

It seems to me that these considerations, even if accurate, stray very far afield from an effort to determine what the Legislature intended when it adopted in § 79G what appears to be an uncomplicated exception to the hearsay rule. But the court's concern with potential juror prejudice is not accurate. Judges and attorneys experienced with trial practice agree in large part that jurors overwhelmingly fulfil their obligations with great seriousness, follow instructions, see *Gath* v. *M/A-Com, Inc.*, 440 Mass. 482, 493 (2003), and do not decide cases based on the status of parties. To the extent that there are exceptions, in my view, those jurors are as likely to be resentful of the rich as they are to be prejudiced against the poor. Be that as

it may, it is not for us to restrict a legislative authorization of the use of certain kinds of evidence because we surmise (with little empirical support) that that evidence will be misused.

Suspicious of the effect on the jury of evidence regarding actual payments in the case being tried, the court packages a complex assemblage of permissible evidentiary questions from which it expects that jurors will distill what to do in an individual case. Thus, evidence may now be received regarding the "range" of payments that providers will accept and that such range is composed of varying payments by individuals and third-party payors. Experts may, and undoubtedly will, testify regarding billing, discounting, and the relationship of each to the reasonable value of the underlying services. Nothing, however, can be received that might indicate what actually happened in the case: not the identity of the third-party payor; not the payment practices of that third-party payor; and most assuredly not the amount that that third-party actually paid. If nothing else, the approach certainly gives new meaning to the concept of relevance.

It also invites more complicated, more expensive, and more prolonged discovery and trials. Plaintiffs in particular will feel obliged to attempt to penetrate various industry practices, while the complexities and costs of defense will also be affected. Those additional costs will inevitably find their way into the rate structures. The result of all this is that jurors will receive a considerable education regarding health care practices, probably much more than necessary to decide the case before them, but will have considerable difficulty applying the information to the case at hand. Trial judges will be under increased pressure to make certain that proffered evidence does not stray too close to what actually happened in the case, contrary to their normal role, and jurors will remain mystified by the refusal to tell them what a given procedure actually cost. In sum, we move farther and farther from the objective of valuing the medical services provided to the injured plaintiff.

If, in fact, we ever needed to shield jurors from the reality of insurance or other mechanisms by which another pays a party's tort damages, we need not do so now. Jurors know insurance exists; they have it themselves. Yet we cling to a curious practice whereby we attempt to deny to a juror, who may himself or herself that day have submitted a claim to a health carrier, the

fact that a party in the case before him also has insurance coverage. The court today recognizes this reality but coyly deprives that juror of a complete picture of how that insurance has operated in the case on trial.

We send criminal defendants to prison for life on the assumption that jurors listen to, understand, and abide by a judge's instructions. See *Commonwealth* v. *Donahue*, 430 Mass. 710, 718 (2000). We can do the same on the subject of health insurance. Judges can explain effectively that the amount paid may be the product of rates negotiated between a provider and an insurer, and is only one factor that jurors should consider. They can transmit to the jury the underlying purpose of the collateral source rule, i.e., that the tortfeasor should not benefit from the existence of a third-party payor, without depriving the fact finder of the relevant evidence of what was actually paid. Judges can also explain that the chance of an excessive recovery by a plaintiff is reduced because of the creation of liens that reallocate the payments in a more equitable manner. See G. L. c. 111, § 70A; *Scott* v. *Garfield, supra* at 801. Surely this is a better approach than evading the issue and giving the jury a greater opportunity to apply their own assumptions about insurance without guidance from the court.

I acknowledge that the Legislature in 1986 effected a modest change in the collateral source rule with respect to medical malpractice cases, see G. L. c. 231, § 60G, inserted by St. 1986, c. 351, § 25, whereby there is authorized a postverdict procedure for reducing awards of damages on the basis of evidence of insurance payments and the cost of obtaining coverage. The court worries that the ensuing quarter century of inaction may mean that the Legislature is wedded to the collateral source rule and desires that it be left unchanged. I doubt that is so. Legislative bodies routinely defer action on complicated issues until a critical mass is reached, and I suspect that that is the case here. As I have indicated, the collateral source rule is a product of common law, and we are empowered to alter or eliminate it.

Last year, a thoughtful concurrence by Justice Cordy in *Scott* v. *Garfield, supra* at 802 (Cordy, J., concurring), appeared to point the way toward a more realistic treatment of this subject. The court now appears to have rejected that suggested new direction. I would pursue it by opening up all evidence that

bears in any way on the determination of the reasonable value of medical services. See, e.g., *Stanley* v. *Walker*, 906 N.E.2d 852, 858 (Ind. 2009) (bills and amounts paid admissible, though court suggests there should be no reference to insurance); *Robinson* v. *Bates*, 112 Ohio St. 3d 17, 20, 22-23 (2006) (construing statute similar to G. L. c. 233, § 79G, to permit admission of both medical bills and amounts accepted by providers).