# Illinois Official Reports

## Appellate Court

---

### *Verci v. High*, 2019 IL App (3d) 190106

---

| | |
|---|---|
| Appellate Court Caption | DAWN VERCI, Plaintiff-Appellee, v. MICHAEL HIGH and INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 649, Defendants-Appellants. |
| District & No. | Third District<br>No. 3-19-0106 |
| Filed<br>Modified upon<br>denial of rehearing | December 18, 2019<br><br>January 23, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Tazewell County, No. 11-L-129; the Hon. Michael D. Risinger, Judge, presiding. |
| Judgment | Certified questions answered; cause remanded. |
| Counsel on Appeal | Jo T. Wetherill, of Quinn, Johnston, Henderson, Pretorius & Cerulo, of Peoria, for appellants.<br><br>Todd A. Strong, of Strong Law Offices, of Peoria, for appellee. |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion.<br>Justices Holdridge and O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1    In March 2014, plaintiff Dawn Verci filed negligence claims against defendants Michael High and International Union of Operating Engineers, Local No. 649. Plaintiff claims that as a result of defendants' negligence, she was injured and required to undergo medical treatment costing in excess of $1 million. A majority of plaintiff's medical charges are from Dr. Richard Kube of the Prairie Spine and Pain Institute and the Prairie Surgicenter. The reasonable value of the medical services provided by Kube is a major issue of contention.

¶ 2    In January 2019, the trial court entered an order (1) prohibiting defendants from cross-examining Kube or his associated medical entities regarding their own cash advertised pricing at trial and (2) allowing defendants' billing expert, Rebecca Reier, to testify at trial regarding her opinions on the reasonable value of Kube's medical services. Soon thereafter, the parties filed a joint petition for interlocutory appeal. The trial court granted the petition and certified two questions challenging the court's order. We answer both certified questions in the affirmative and remand for further proceedings.

## I. BACKGROUND

¶ 3

¶ 4    On March 14, 2012, plaintiff filed her first amended complaint, alleging negligence against each defendant. Plaintiff claims that, as a result of defendants' negligence, she was physically injured, required to undergo medical treatment, and incurred over $1 million in charges for her treatment. Approximately $800,000 of plaintiff's alleged medical expenses arise out of treatment plaintiff received from Dr. Richard Kube at the Prairie Spine and Pain Institute and the Prairie Surgicenter. Both entities are owned and operated by Kube.

¶ 5    In discovery, defendants disclosed the identity of an expert, Rebecca Reier, to present testimony regarding the reasonable value of plaintiff's medical services. Reier prepared a report, which was provided to plaintiff. In her report, Reier reviewed Kube's total charges of $810,937.04, and concluded that "the Usual, Customary and Reasonable total *charges* for the same geographic area for the same services are approximately $148,118.00." (Emphasis in original.) One of the bases for Reier's conclusion was the cash prices advertised by Prairie Spine and Pain Institute and Prairie Surgicenter on Healthcare.com. Reier determined that the charges submitted to plaintiff by Kube are more than 547% higher than the prices advertised online by both entities for the same procedures. Sources Reier used in determining the usual, reasonable, and customary charges for the medical services plaintiff received include "Fair Health Data Systems," "Optum National Fee Analyzer 2012-2016—Fair Health Database," and "The American Hospital Directory CMA and Fair Health Database." According to Reier's report, "Fair Health collects charge data from private insurer and health plan administrators across the country." Plaintiff filed a motion and later a supplemental motion to bar Reier's testimony.

¶ 6    Reier was deposed in 2018. She explained that in determining the reasonable value of medical services, she relied on three databases: (1) FAIR Health, (2) Optum, which also uses FAIR Health data, and (3) American Hospital Directory. She identified FAIR Health as "[t]he primary database" she used.

¶ 7    Reier explained that FAIR Health receives all of its data from insurance companies. Insurance companies report the charges they receive from medical providers to FAIR Health,

and FAIR Health separates the data geographically. FAIR Health then identifies a range of charges, from the 5th to 95th percentile. Outliers are eliminated, so if a provider charges a very different rate than others, that rate is not included in the database because it is "not considered statistically significant by FAIR Health." Reier determined that a reasonable charge would be at the 75th percentile, which means "75 percent of all the providers in this geographic area charge this amount or less." She chose the 75th percentile because it is her "peer group's choice among, like, your planners as well as practitioners and practice managers. It seems to be the fairest way to identify what everybody in the neighborhood is charging."

¶ 8     In the FAIR Health database, providers are identified by geographical area. FAIR Health does not identify providers by name. Reier did not reach out to providers in the geographic area to determine what they charge. She relied exclusively on the data from FAIR Health. With respect to FAIR Health's methodology, Reier stated, "[W]e have to bring in the Fair Health attorneys, because they will be glad to explain in detail methodology since none of us are statisticians." She later stated, "I have their, their standard protocol which I can provide. And as I have said, if there is a question about their protocol, their data analysis, um, the attorneys are more than willing to come and speak."

¶ 9     Reier also relied on data from Optum. Optum takes the FAIR Health data and separates it into smaller geographical areas. Reier did not look at the actual data that Optum collected. Reier assumes that Optum and FAIR Health correctly performed their statistical analyses. She has not seen the raw data used by Optum or FAIR Heath but sees the results of their statistical analyses, which is what she uses in her medical billing analyses.

¶ 10     According to Reier, FAIR Health is the largest collector of data. Reier did not identify how many insurance companies report their charges to FAIR Health, nor did she state what percentage of insurers provide data to FAIR Health. There are other databases like FAIR Health, but Reier does not use them "because they're not big enough[,] and the bigger the better." Reier's opinions are based on the information from FAIR Health that was contained in its own database or passed on to Optum. Reier agreed that she relies on the data accumulated by FAIR Health but does not have direct access to the actual data that FAIR Health uses. She did not make any effort to contact individual medical providers or outpatient centers to determine what they charge.

¶ 11     Reier believes that the cash price a medical provider offers to patients has some bearing on the reasonable value of the service provided. She does not think a provider would offer a cash price that would cause him or her to lose money. She would not expect the cash price for a service to be six-and-a-half times less than a charged price.

¶ 12     Kube also provided deposition testimony. He testified that the cash price of a procedure "represents or illustrates what I think would be a fair reimbursement for my services under that [cash] model and everything that it entails." He believes that he has advertised cash prices for surgical procedures for the past two or three years.

¶ 13     On January 25, 2019, the trial court entered an order stating:

"1. Defendant will not be allowed to cross-examine Dr. Kube or his associated medical entities with regard to their own cash advertised pricing at trial.

2. Rebecca Reier, defendant's billing expert, will be allowed to testify at trial regarding her opinions on the reasonable value of the medical services at issue in the

litigation. Plaintiff is allowed to cross-examine Reier with regard to the data she relies on as the basis for her opinions."

The parties filed a joint petition for appeal, pursuant to Illinois Supreme Court Rule 308 (eff. July 1, 2017). The trial court granted the petition and certified the following questions for review:

> (1) "Did the Trial Court err in denying the defendants' right to cross-examine Dr. Kube and his associated medical entities with prices advertised by Dr. Kube and the same associated medical entities as prices that represent the reasonable value for the services rendered[?]"

> (2) "Did the Trial Court err in allowing defendants' billing expert, Rebecca Reier, to testify over plaintiff's objection when the defendant's expert relies upon geographically zip coded information collected by national databases rather than personally obtained medical billing comparisons[?]"

## II. ANALYSIS

The scope of review in an interlocutory appeal brought under Rule 308 is limited to the certified questions. *Spears v. Association of Illinois Electric Cooperatives*, 2013 IL App (4th) 120289, ¶ 15. Certified questions are reviewed *de novo*. *Id.*

An injured plaintiff is entitled to recover reasonable medical expenses. *Klesowitch v. Smith*, 2016 IL App (1st) 150414, ¶ 44. In order to recover such expenses, the plaintiff must prove (1) that she has paid or become liable to pay a specific amount and (2) that the charges were reasonable for services of that nature. *Barreto v. City of Waukegan*, 133 Ill. App. 3d 119, 130 (1985).

Illinois follows the collateral source rule. *Boden v. Crawford*, 196 Ill. App. 3d 71, 76 (1990). "Under the collateral source rule, benefits received by the injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor." *Wilson v. The Hoffman Group, Inc.*, 131 Ill. 2d 308, 320 (1989). The purpose of the rule is to prevent jurors from learning anything about collateral income that could influence their decision. *Boden*, 196 Ill. App. 3d at 76.

The collateral source rule has both evidentiary and substantive components. *Wills v. Foster*, 229 Ill. 2d 393, 400 (2008). As a rule of evidence, it prevents defendants from introducing any evidence that all or part of a plaintiff's losses have been covered by insurance. *Id.* As a substantive rule, it bars a defendant from reducing the plaintiff's award by the amount the plaintiff received from a collateral source. *Id.*

Illinois and most other states follow the reasonable value approach to the collateral source rule. See *id.* at 407-13. "Courts applying this approach hold that the plaintiff is entitled to recover the reasonable value of medical services and do not distinguish between whether a plaintiff has private insurance or is covered by a government program." *Id.* at 407. "The vast majority of courts to employ a reasonable-value approach hold that the plaintiff may seek to recover the amount originally billed by the medical provider." *Id.* at 410. Under the reasonable-value approach, the plaintiff may place the entire billed amount into evidence, provided that the plaintiff also establishes the bill's reasonableness. *Id.* at 414.

When a bill has not yet been paid, the plaintiff "can establish reasonableness by introducing the testimony of a person having knowledge of the services rendered and the usual and

customary charges for such services." *Arthur v. Catour*, 216 Ill. 2d 72, 82 (2005). When a witness is shown to possess the requisite knowledge, the reasonableness requirement necessary for admission of the bill is satisfied if the witness testifies that the bill is fair and reasonable. *Id.*

¶ 21    After the plaintiff presents testimony that a bill is reasonable, the defendants can still challenge it. "[D]efendants are free to cross-examine any witnesses that a plaintiff might call to establish reasonableness, and the defense is also free to call its own witnesses to testify that the billed amounts do not reflect the reasonable value of the services." *Wills*, 229 Ill. 2d at 418; see also *Baker v. Hutson*, 333 Ill. App. 3d 486, 494 (2002) ("The defendant may rebut the *prima facie* reasonableness of a medical expense by presenting proper evidence casting suspicion upon the transaction."). However, defendants cannot introduce evidence that the plaintiff's bills were settled for an amount less than the billed amount because to do so would undermine the collateral source rule. *Wills*, 229 Ill. 2d at 418.

¶ 22                    A. Admissibility of Advertised Cash Prices

¶ 23    " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). "All relevant evidence is admissible, except as otherwise provided by law." Ill. R. Evid. 402 (eff. Jan. 1, 2011). "Evidence which is not relevant is not admissible." *Id.*

¶ 24    Defendants may introduce any relevant evidence of the reasonable value of medical services that is not barred by the collateral source rule. See *Wills*, 229 Ill. 2d at 418; *Melo v. Allstate Insurance Co.*, 800 F. Supp. 2d 596, 602 (D. Vt. 2011). Such evidence includes "testimony about the range of charges the provider has for the same services." *Weston v. AKHappytime, LLC*, 445 P.3d 1015, 1028 (Alaska 2019); see also *Melo*, 800 F. Supp. 2d at 602 (relevant evidence of the reasonable value of medical services includes "evidence as to what the provider usually charges for the services provided"); *Law v. Griffith*, 930 N.E.2d 126, 135 (Mass. 2010) (a party wishing to challenge the reasonableness of a medical bill may "elicit evidence concerning the provider's stated charges"). Such evidence does not undermine the collateral source rule because it does "not touch in any manner on whether, or in what amount, collateral third parties (whether a private insurance company, Medicare, or Medicaid) had paid for the medical treatment the plaintiff received." *Law*, 930 N.E.2d at 135-36.

¶ 25    Here, the trial court refused to allow defendants to cross examine Kube about the cash prices that the medical entities he owns and operates advertise for their services. This was error because the range of fees Kube charges for the services plaintiff received is admissible and not barred by the collateral source rule. See *Weston*, 445 P.3d at 1028; *Melo*, 800 F. Supp. 2d at 602; *Law*, 930 N.E.2d at 135-36. Thus, we answer the first certified question in the affirmative, finding that the trial court erred in prohibiting testimony about Kube's advertised cash prices.

¶ 26                    B. Admissibility of Reier's Testimony

¶ 27    Defendants are free "to offer their own evidence pertaining to the reasonableness of the charges." *Arthur*, 216 Ill. 2d at 83. Defendants may call their own witnesses to testify that the billed amounts do not reflect the reasonable value of the services. *Wills*, 229 Ill. 2d at 418. Defendants may also present testimony about what other providers in the area charge for the same services. See *Weston*, 445 P.3d at 1028; *Melo*, 800 F. Supp. 2d at 602.

¶ 28    Reier prepared a report and provided deposition testimony allegedly purporting to establish what other providers in the area charge for the services Kube provided plaintiff. Reier stated that her opinions were based primarily on data from the FAIR Health database.

¶ 29    However, the information contained in the FAIR Health database is not evidence of what other area providers charge for the services plaintiff received because (1) the data comes from an unknown number of insurance companies, not health care providers, (2) the database is used to determine reimbursement rates, not the reasonableness of provider charges, and (3) the data contained in the database is incomplete. Thus, the information Reier relied on does not establish what other providers in the area charge.

¶ 30    The FAIR Health database does not establish what medical providers charge for various procedures because the information contained in the FAIR Health database comes from insurance companies, not medical providers. Medical providers are prohibited from submitting data to FAIR Health. See *FAQs*, FAIRHealth.org, https://www.fairhealth.org/faqs (last visited Dec. 9, 2019) [https://perma.cc/6AYH-5XBJ]. As a result, charges submitted to uninsured patients are not included in the FAIR Health database. This is problematic because uninsured patients are often billed higher amounts than insured patients. See George A. Nation III, *Healthcare and the Balance-Billing Problem: The Solution Is the Common Law of Contracts and Strengthening the Free Market for Healthcare*, 61 Vill. L. Rev. 153, 153-54 (2016); Tamara R. Coley, *Extreme Pricing of Hospital Care for the Uninsured: New Jersey's Response and the Likely Results*, 34 Seton Hall Legis. J. 275, 307 (2010). Physicians charge uninsured patients, on average, more than twice what they charge insurers. Johanna Catherine Maclean *et al.*, *Health Insurance Expansions and Providers' Behaviors: Evidence from Substance-Use-Disorder Treatment Providers*, 61 J.L. & Econ. 279, 286 (2018). Because the FAIR Health database does not include amounts charged to uninsured patients, it is not a true representation of what medical providers charge. Furthermore, Reier could not identify any medical providers whose charges were included in the FAIR Health database, nor could she state whether a specific provider's charges were included in the database because the database does not contain that information.

¶ 31    Not all insurance companies provide information to FAIR Health. Only those insurance companies that choose to report data to FAIR Health are included in the database. Reier testified that the FAIR Health database is the largest of its kind. However, she could not testify about the number of insurers that provide information to FAIR Health. She also provided no information as to what percentage of insurers submit their data to FAIR Health. Because it is unknown how many insurers were included in the database at the time of plaintiff's treatment, or at any given point, the FAIR Health data does not constitute proof of the fair and reasonable charges for the services plaintiff received. See *N.E. Physical Therapy Plus, Inc. v. Liberty Mutual Insurance Co.*, 995 N.E.2d 57, 63 (Mass. 2013) (finding predecessor database to FAIR Health could not be relied on to establish reasonableness of medical charges, in part, because "it relie[d] on the voluntary submission of data on medical costs from the limited universe of insurance companies who choose to participate in the program").

¶ 32    The FAIR Health database is most commonly used "by private health insurers to calculate the 'usual and customary' fee for specific procedures and inform the amounts that they will be willing to pay to out-of-network providers." *UnitedHealthcare Services, Inc. v. Asprinio*, 16 N.Y.S.3d 139, 145 (2015). Data from FAIR Health is used to set reimbursement rates. See *New Jersey Healthcare Coalition v. New Jersey Department of Banking & Insurance*, 111 A.3d

716, 724 (N.J. Super. Ct. App. Div. 2015). Reimbursement rates are not relevant to show whether a medical charge is reasonable. See *Gerlach v. Cove Apartments, LLC*, 446 P.3d 624, 633 (Wash. Ct. App. 2019); see also *State v. Campbell*, 438 P.3d 448, 457 n.14 (Or. Ct. App. 2019) (reasonable value of medical charges not ordinarily proved through evidence of reimbursement rates); *Leitinger v. Van Buren Management, Inc.*, 720 N.W.2d 152, 157-58 (Wis. Ct. App. 2006) (reimbursement rates are not evidence of the reasonable value of medical services for purposes of determining damages in a tort claim). An expert witness should not be allowed to testify that a provider's medical charges are unreasonable based on reimbursement rates. See *Gerlach*, 446 P.3d at 633. Testimony about reimbursement rates is not only irrelevant but also violates the collateral source rule. See *Campbell*, 438 P.3d at 457 n.14.

¶ 33　　Finally, the data contained in the FAIR Health database is incomplete. It does not include all charges billed by providers but only those charges submitted to insurers, which then report them to FAIR Health. Additionally, as explained by Reier, if a charge is an "outlier," meaning it is higher or lower than other charges submitted for the same procedure, it is excluded from the database. Because not all medical charges are included in the database, the database does not provide a complete picture of provider charges.

¶ 34　　Here, Reier stated that the primary source for her opinions on the reasonable value of plaintiff's medical services was the FAIR Health database. The data does not come from providers but comes from an unknown number of insurance companies and is used to set reimbursement rates, not to determine the reasonableness of medical charges. Moreover, the data is incomplete. For these reasons, we answer the second certified question in the affirmative, finding that the trial court erred in allowing Reier to testify regarding the reasonable value of the medical services plaintiff received.

¶ 35　　　　　　　　　　　　　III. CONCLUSION

¶ 36　　We answer the certified questions in the affirmative and remand the cause for further proceedings.

¶ 37　　Certified questions answered; cause remanded.