DAVID vs. KELLY, 100 Mass. App. Ct. 443

 
 MICHAEL A. DAVID vs. JONATHAN P. KELLY & another. [Note 1]

100 Mass. App. Ct. 443
 March 2, 2021 - October 25, 2021

Court Below: Superior Court, Middlesex County
Present: Sullivan, Desmond, & Singh, JJ.

 

Dog. Insurance, Workers' compensation insurance. Workers' Compensation Act, Compensation, Medical benefits, Proximate cause, Public employee, Expert opinion. Evidence, Income from collateral source, Expert opinion, Medical record. Contract, Settlement agreement, Construction of contract. Witness, Expert, Physician. Practice, Civil, Instructions to jury. Negligence, Causation.

This court concluded that an agreement by the parties in a civil action to cap the defendants' liability in exchange for insuring that the plaintiff received a minimum recovery in the event that the jury returned an award did not constitute a waiver of the defendants' appellate rights. [446-447]

In a civil action brought by the plaintiff mail carrier who had been bitten by the defendants' dog while covering a vacationing coworker's delivery route, although the judge erred in admitting evidence that the plaintiff had received workers' compensation benefits and in instructing the jury as to the amount of those benefits, the error did not so infect the trial as to require this court to reverse the judgment or order a new trial, where the judge gave the jury clear and forceful instruction as to the limited use of the evidence. [447-453] Singh, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on September 6, 2016. 

 The case was tried before Kathe M. Tuttman, J., and a motion for a new trial was considered by her. 

 Peter E. Heppner for the defendants.

 Marianne C. LeBlanc for the plaintiff.

 SULLIVAN, J. On May 27, 2014, mail carrier Michael A. David was covering a vacationing coworker's mail route in the town of Harvard. When he got out of his mail truck to deliver mail at the home of Jonathan P. Kelly and Donna Kelly, the Kellys' dog, a German shepherd and golden retriever mixed breed named Chewbacca, bit him. After a jury trial, David was awarded $375,000 in damages for injuries sustained.

 Page 444 

 In a subsequently filed motion for a new trial, the Kellys contended, as they had in pretrial motions in limine, that the evidence that David received Federal workers' compensation benefits in the amount of $57,318 was admitted in violation of the collateral source rule. David opposed the motion on the merits and on the grounds that any challenge to the verdict was barred by the parties' "hi-low" agreement. In this appeal from the judgment on the verdict and the denial of the motion for a new trial, we conclude that the appeal is not barred, and that although the amount of the payment should not have been admitted, any error did not substantially affect the rights of the defendants. Accordingly, we affirm the judgment and the order denying the motion for a new trial.

 Background. We summarize the evidence at trial as the jury could have found it, noting conflicts in the evidence, and reserving certain facts for later discussion. David, a mail carrier for the United States Postal Service (post office), was covering a vacationing coworker's mail route. When David arrived at the Kellys' house, the dog approached him. He offered a dog treat with one hand. Instead of taking the treat, the dog latched on to David's wrist at the back "hinge point" of its jaw, and "shook [the wrist] violently for about five to ten seconds." David yanked his wrist out of the dog's mouth. The dog immediately bit him on his left thigh. David shook the dog off and shoved a package into the dog's mouth. Undeterred, the dog came at David again. David "slapped" the dog with the mail in his hand, and while the dog was "dazed," retreated to his truck and shut the door.

 Donna Kelly [Note 2] appeared at the doorway to the house and called the dog in. She asked David "if the dog had gotten [him]." David replied in the affirmative and showed her the bite on the leg, which had broken the skin. David testified at trial that he told Donna the dog also bit him on the wrist, although he was not "[one hundred] percent sure" of this. Donna testified that David told her about the bite on the leg, but not the bite on the wrist.

 Donna shared with David that she told the usual mail carrier to "beep" if she had a package "so that [Donna] could come out if the dog was outside." David then said he had to call the Harvard postmaster and seek medical treatment. Donna testified that David said he was going home. David denied that he said he was going home.

 Page 445 

 David called the postmaster and drove back to the Harvard post office. The postmaster took photographs of David's thigh and wrist. One photograph depicted a wound to the upper thigh that broke the skin. A second photograph showed an indentation consistent with a sharp tooth mark and reddening of the surface of the skin on the wrist. The skin on the wrist was not broken.

 David sought treatment at Nashoba Valley Medical Center (Nashoba Valley). Medical personnel cleaned and dressed the leg wound and checked his wrist. There was reddening but no swelling of the wrist. David tested "five out of five" on a grip strength test, which meant that he had "[n]ormal strength." After a follow-up appointment, David returned to work on June 3, 2014.

 Upon returning to work, David began to experience pain in his wrist. His job duties included sorting and bundling the mail, which required both grasping and pulling. He continued to work, but on the second day the pain was more severe. Doctors at Nashoba Valley ordered further X-rays and referred David to an orthopedic surgeon, who ordered a magnetic resonance imaging scan (MRI).

 When more conservative therapies failed to provide relief, he underwent surgery in April of 2015. Pain persisted and he had cortisone injections. After wearing a splint and undergoing physical therapy without significant improvement, David had a second MRI and underwent a second surgery. [Note 3] The second surgery provided some benefit, but he continued to experience pain and numbness while driving and with activity. David did not return to work at the post office, and in 2018, the post office terminated his employment.

 Prior to trial, the plaintiff's expert, Dr. Hillel D. Skoff, performed an examination of the plaintiff, which included both a physical examination and a review of the medical records. The defendants' medical expert, Dr. Hervey L. Kimball, reviewed the plaintiff's medical records but did not perform a physical examination. Both experts testified by video deposition at trial, and gave markedly different opinions, as is discussed more fully infra.

 The defendants stipulated to liability under the dog-bite statute. G. L. c. 140, § 155. The contested issue at trial was causation -- whether the full extent of David's wrist injury was in fact caused 

 Page 446 

by a dog bite or something else. [Note 4] Before trial, David moved to introduce the receipt of Federal workers' compensation benefits in the amount of $57,318, a motion which the defendants opposed on the grounds that the jury would treat the payment as evidence of causation and resulting injury. The judge allowed the motion. On the last day of trial, the parties entered into a hand-written high-low agreement, setting a floor of $150,000 and a ceiling of $1 million. The jury returned a verdict for the plaintiff in the amount of $375,000 for injuries and damages causally related to the dog bite. Following the verdict, the defendants filed the motion for a new trial, which was denied. This appeal followed.

 Discussion. 1. High-low agreement. The parties entered into the following agreement at trial:

"The parties hereby agree to the following 'hi-low' agreement. If the jury verdict award is anything less than $150,000, inclusive of interest, the defendants will pay the amount of $150,000 to the plaintiff. If the jury verdict award is equal to or less than $150,000, but with interest exceeds the amount of $150,000, the parties agree that the defendants will pay the plaintiff the amount of $150,000. If the jury verdict is in an amount that exceeds $150,000, the defendants will pay the entire amount of the verdict, including statutory interest thereon, but in no event will the defendants pay more than the amount of $1,000,000 (one [m]illion [d]ollars), which are the defendants' policy limits."

David asserts that this agreement constituted a waiver of the Kellys' appellate rights.

 High-low agreements cap a defendant's liability in exchange for ensuring that the plaintiff receives a minimum recovery in the event that the jury returns an award. While there is little law in Massachusetts regarding high-low agreements, such agreements are a contract like any other. We therefore turn to the ordinary rules of contract construction. Applying these rules, we reject David's contention.

 The contract here is not susceptible of a reading that includes a waiver of appellate rights. "[W]hen the language of a contract is clear, it alone determines the contract's meaning." Balles v. Babcock Power Inc., 476 Mass. 565, 571 (2017). "'[W]aiver must be shown clearly, unmistakably, and unequivocably' (citation omitted)."

 Page 447 

 Psychemedics Corp. v. Boston, 486 Mass. 724, 745 (2021), quoting Boston v. Labor Relations Comm'n, 48 Mass. App. Ct. 169, 174 (1999). [Note 5] The high-low agreement makes no reference to postverdict or appellate rights; language regarding a waiver of appellate rights is altogether absent. The inclusion of the words "will pay" does not create a clear and unmistakable waiver of appellate rights in the absence of explicit language in the contract. See Psychemedics Corp., supra. [Note 6]

 2. Collateral source evidence. With respect to the admission of collateral source evidence, "we review the trial judge's evidentiary ruling for an abuse of discretion or error of law." Antoniadis v. Basnight, 99 Mass. App. Ct. 172, 176 (2021). [Note 7] "We do not disturb the trial judge's ruling simply because [we] might have reached a different result" (quotation and citation omitted). Id. Similarly, "[w]e review the denial of the defendants' motion for a new trial for abuse of discretion, . . . extending considerable deference where the trial judge and the motion judge were the same" (quotation and citation omitted). Parsons v. Ameri, 97 Mass. App. Ct. 96, 103 (2020).

 Evidence of collateral source income is ordinarily excluded because "jurors might be led by the irrelevancy to consider plaintiffs' claims unimportant or trivial or to refuse plaintiffs' verdicts or reduce them, believing that otherwise there would be unjust double recovery." West v. Shawmut Design & Constr., 39 Mass. App. Ct. 247, 250 (1995), quoting Goldstein v. Gontarz, 364 Mass. 800, 809 (1974). Typically, the admissibility of insurance or workers' compensation benefits has arisen in situations

 Page 448 

 where the defendant seeks to introduce evidence of collateral source income. In that context, our courts have ruled that introduction of collateral source income is unfair and prejudicial to the plaintiff, unless relevant for some independent purpose, such as to show that the plaintiff is malingering, that claims of poverty are untrue, or to elicit some other facts bearing on credibility. See West, supra at 251; Corsetti v. Stone Co., 396 Mass. 1, 17-20 (1985).

 This case is the inverse of the usual one. Here the plaintiff sought to introduce evidence of payment of $57,318 in Federal workers' compensation benefits. He further requested that the jury be told that he would be required to repay the government if damages were awarded. He argued that such evidence was necessary in order to avoid any suggestion that he was seeking a double recovery. The judge observed that the knowledge of insurance and workers' compensation benefits was sufficiently widespread amongst jurors that it was her usual practice to advise "jurors that whether a party is insured is not an issue and they shouldn't consider it," and "where there is a lien, . . . [and] if there is a recovery, then the lien will have to be paid back out of the recovery." The defendant had no objection to this generic observation.

 The defendants did object, however, to telling the jury that the plaintiff had been awarded workers' compensation benefits in a particular amount. They objected on the grounds that the jury could infer from the fact that compensation was paid that an insurance company or the Federal government had determined that there was a causal relationship between the dog bite to the wrist and the full amount of damages paid, and that once the amount was introduced, the jury would use that as a "baseline for damages." The judge recognized that the relief sought posed the risk that the jury would "infer from the fact that he received those benefits, that there was a determination he was entitled to those benefits." The judge took the matter under advisement. Before trial began, however, the judge ruled that full disclosure was the better course, that the jury should know that workers' compensation benefits did not provide full wage replacement, that the evidence was admissible, and that the plaintiff could refer to it in his opening statement. [Note 8] The judge also indicated that she would give a strong instruction to ameliorate any prejudice. At the conclusion

 Page 449 

 of the evidence and before closing arguments, the judge instructed:

"You have heard evidence that the plaintiff Mr. David received certain workers' compensation benefits in this case for medical expenses and lost wages. If you the jury award damages to Mr. David, then the [c]ourt is required to make deductions to your award to repay the workers' compensation insurer for those benefits Mr. David has already received. As a matter of law, the workers' compensation insurer will be repaid only if Mr. David recovers damages in this action. In other words, Mr. David is under no obligation to repay those benefits out of his own pocket. Additionally, you may not infer from the fact that Mr. David received workers' compensation benefits that any determination was made that Mr. David's medical expenses and lost income were causally related to the incident with the Kelly[s'] dog. You the jury must determine causation on the basis of the other evidence presented at the trial."

(Emphasis added.)

 The judge did not abuse her considerable discretion in observing that jurors are likely aware of the existence of insurance and workers' compensation benefits. See Law v. Griffith, 457 Mass. 349, 360 (2010) ("certainly jurors are aware that health insurance is a present day reality"); Goldstein, 364 Mass. at 813 ("censored subjects . . . may insinuate themselves into the case through casual assumptions by the jurors, for example, assumptions about the prevalence of liability insurance or the availability of workmen's compensation"). Nor did the judge abuse her discretion in determining that a general instruction was desirable to inform the jury that plaintiffs are required to repay benefits from any damages award if the plaintiff had in fact received benefits. Cf. Scott

 Page 450 

 v. Garfield, 454 Mass. 790, 801 (2009) (approving generic instruction where "[n]othing about the judge's statement to the jury suggested that a third source had, in fact, paid [the plaintiff's] medical bills or that a medical lien existed"). As noted, the defendants did not object to such an instruction.

 Here, however, the ruling went one step further, informing the jury that benefits were awarded, and the amount of those benefits. A judge must weigh the probative value of collateral source evidence against its prejudicial effect. See Antoniadis, 99 Mass. App. Ct. at 176. In this case, the only questions left for resolution by the jury were the nature and extent of the injuries caused by the dog and the resulting damages. There was an inherent risk of prejudice in admitting evidence of payment of workers' compensation benefits because the receipt of benefits could suggest to the jury that a third party determined that the defendants' conduct was the cause of the injury.

 We therefore conclude that it was an error of judgment and an abuse of discretion to admit evidence that workers' compensation benefits had been paid. See Goldstein, 364 Mass. at 808-810. The judge could have instructed the jury regarding the obligation to repay collateral source income without allowing evidence that such benefits had in fact been paid, or the amount of the payment. See Law, 457 Mass. at 356-361; Scott, 454 Mass. at 801. The medical bills and lost wage damages were provable by other means. See Law, supra. Indeed, the plaintiff had prepared an exhibit containing the medical bills, but the exhibit was not introduced once the motion in limine was allowed. David testified to the amount received, an amount which covered both partial wage replacement and medical bills, without distinguishing between the two. [Note 9]

 We therefore turn to the question of prejudice. On direct appeal, "[a]n error in the admission of evidence should not be ground for 

 Page 451 

a new trial unless the error has injuriously affected the substantial rights of the parties" (quotation and citation omitted). Coady v. Wellfleet Marine Corp., 62 Mass. App. Ct. 237, 244 (2004). See G. L. c. 231, § 119; Mass. R. Civ. P. 61, 365 Mass. 829 (1974). Similarly, on a motion for a new trial, "a new trial should be granted only when 'on a survey of the whole case it appears to the judge that otherwise a miscarriage of justice would result.'" Fitzpatrick v. Wendy's Old Fashioned Hamburgers of N.Y., Inc., 487 Mass. 507, 514 (2021), quoting Wojcicki v. Caragher, 447 Mass. 200, 216 (2006). See Spiller v. Metropolitan Transit Auth., 348 Mass. 576, 580 (1965); Evans v. Multicon Constr. Corp., 6 Mass. App. Ct. 291, 295 (1978). The judge gave a strong instruction that the jury could not draw any inference from the receipt of workers' compensation benefits that the injuries were causally related to the dog bite, thus mitigating any prejudice. See Gath v. M/A-Com, Inc., 440 Mass. 482, 492-493 (2003) (curative instruction remedied counsel's improper questions and arguments); Evans, supra at 296 (judge's instruction cured improper argument by counsel). Cf. Harris-Lewis v. Mudge, 60 Mass. App. Ct. 480, 488-490 (2004). The jury are presumed to have followed the judge's instructions. See id. at 490. See also Gartland v. Freeman, 277 Mass. 520, 523 (1931). [Note 10] For this reason, we conclude that the error did not so infect the trial that reversal is required.

 On this point, Harris-Lewis, 60 Mass. App. Ct. 480, is instructive. That appeal arose from a defense verdict in the retrial of a medical malpractice case brought by the executrix of the estate of Reginald Lewis, a professional basketball player for the Boston Celtics, who collapsed on the court during a professional game in 1993 and died several months later while playing basketball with friends. Id. at 481-482. On motion of the defendant, the judge initially admitted evidence of representations made by Lewis on an application for insurance. Id. at 484-485. The Celtics contract, which showed that Lewis's wife continued to receive Lewis's salary, was also admitted in evidence. Id. at 487. The value of the contract was explained to the jury. Id. at 488. The judge initially

 Page 452 

 ruled that whether Lewis had misrepresented his medical history on the insurance application was relevant to the malpractice claim, and that the value of the contract was also evidence of a motive to lie. Id. at 487-488.

 The evidence was admitted de bene, however. Id. at 487. As the case progressed, the relevance of the contested evidence became less clear, and the plaintiff moved to strike it. Id. at 488. By agreement of the parties the jury ultimately were instructed that the evidence was "out of the case and to disregard [it]." Id. at 489. On appeal, the plaintiff argued that this was a case of too little too late -- the case was hotly contested, medical causation was at issue, and "irreversible prejudice . . . had already occurred." Id. We held that "[e]rroneously admitted evidence of insurance may be cured by instruction." Id. at 490, citing Goldstein, 364 Mass. at 811. The instruction alone, even in such a highly fraught, emotional, and contested case, cured the prejudice. Harris-Lewis, supra.

 Similarly, here the evidence of receipt of workers' compensation benefits was erroneously admitted, but the judge nonetheless gave a clear and forceful instruction as to the limited use of the evidence. The instruction specified the purposes for which the evidence could and could not be considered. See Goldstein, 364 Mass. at 811 ("Had a strong, even-handed explanation and clarification of the work[ers]' compensation problem been forthcoming from the judge, the situation might have been saved"). Compare West, 39 Mass. App. Ct. at 252-253 (error for judge to admit collateral source evidence and decline to give instruction regarding its use). Under these circumstances, the instruction alone was sufficient to cabin the prejudice.

 Our dissenting colleague points out that David made repeated reference to the workers' compensation payments in his opening statement, testimony, and closing argument. This is indeed true, and were there no instruction, we would agree that the error would be prejudicial. However, we view the record (both on direct appeal and on appeal from the motion for a new trial) in the context of the trial as a whole. See Laramie v. Philip Morris USA, Inc., 488 Mass. 399, 416-417, 420 (2021). The case was tried as a battle of the medical experts, a battle in which workers' compensation benefits played almost no part. It was undisputed that the workers' compensation provider never questioned liability or requested a medical examination of David; benefits were awarded on the basis of the case file.

 Page 453 

 By contrast, the nature and cause of the injuries to David's wrist were vetted extensively at trial. The Kellys' expert opined that the lack of bruising or swelling, coupled with David's normal grip strength shortly after the incident, showed that the ongoing wrist injury was not attributable to the dog bite. David's expert testified that the type of injury he suffered manifested when he twisted or turned the wrist, and that if the grip test was done with the wrist in a neutral position, "then it's very possible that [the ligament] would not [be] provok[ed]," and that this type of injury was not always accompanied by swelling or even apparent on an X-ray or MRI. Arthroscopic surgery was performed in which the surgeon could see tears; repairs were made to the triangular fibromyalgia cartilage complex and the scapholunate ligament. The jury were also told that David rode a motorcycle, and they could have taken that into consideration in deciding the likely cause and extent of his injury.

 "The admission of evidence injuriously affects the substantial rights of a party where the jury might have reached a different result if the evidence had been excluded." Coady, 62 Mass. App. Ct. at 244. We are confident, in light of the judge's instruction, that the jury were able to evaluate the testimony of the experts, review the medical records, and draw their own conclusions, and that the result was not materially 

affected by the collateral source evidence.

 Conclusion. The judgment and the order denying the motion for a new trial are affirmed.

 So ordered.

 SINGH, J. (dissenting). While I agree with the majority's analysis of the high-low agreement and determination that the collateral source evidence was admitted in error, I disagree with the majority's conclusion that the Kellys are not entitled to a new trial. I write separately to emphasize that the evidence was wholly irrelevant and highly prejudicial, and to explain why I believe, in the context of this close case, the jury instructions on the law pertaining to collateral source evidence did not cure the error.

 The "settled law," from which I discern no reason to depart, is that collateral source evidence is inadmissible as irrelevant and

 Page 454 

 prejudicial. [Note Dissent-1] Goldstein v. Gontarz, 364 Mass. 800, 808-809 (1974). The evidence is irrelevant because it has "no bearing on the extent of a plaintiff's injuries or the defendant's liability for them." Rolanti v. Boston Edison Corp., 33 Mass. App. Ct. 516, 523 (1992). Collateral source evidence is also prejudicial, as there is a likelihood juries will be swayed by the irrelevancy. See Goldstein, supra at 809; Antoniadis v. Basnight, 99 Mass. App. Ct. 172, 175 (2021). In some circumstances, however, collateral source evidence may be admissible as probative of the credibility of a witness or of some other relevant proposition. See Corsetti v. Stone Co., 396 Mass. 1, 17 (1985). The general collateral source rule, and its exception, apply to evidence of workers' compensation benefits. See Pemberton v. Boas, 13 Mass. App. Ct. 1015, 1018 (1982).

 The only issue on which David suggested evidence of his workers' compensation benefits was probative was the extent to which he was injured by the Kellys' dog. As David's counsel argued to the trial judge, "[David] was out of work for two years as a result of this injury. [The Kellys] say none of this is related. He should have been back to work in four to six weeks. That is what's coming. And I'm trying to counter that with the truth [that David received workers' compensation benefits for two years]." The extent to which David was injured by the Kellys' dog, however, is the precise issue on which we have held that collateral source evidence has "no bearing." Rolanti, 33 Mass. App. Ct. at 523.

 The trial judge characterized the argument as follows: "[Y]ou're also going to be asking the jury to infer from the fact that [David] received [workers' compensation] benefits[] that there was a determination he was entitled to those benefits[] and[,] therefore, that he wasn't malingering or his injuries weren't caused by some other condition." Any such inference would have been an unreasonable one resulting from mere speculation and conjecture, as there was no evidence regarding (1) how workers' compensation claims were decided, (2) who made the determination that David

 Page 455 

 was entitled to workers' compensation benefits for the full two years he was out of work, (3) what that person's qualifications were, or (4) the basis for that person's determination, including whether a cost-benefit analysis of disputing David's claim was taken into consideration. [Note Dissent-2] See Reading Co-Op. Bank v. Suffolk Constr. Co., 464 Mass. 543, 556 (2013) (to be reasonable, inferences "must be based on probabilities rather than possibilities and cannot be the result of mere speculation and conjecture" [citation omitted]). This case thus proves the rule that collateral source evidence has no bearing on the extent of a plaintiff's injuries or the defendant's liability for them.

 As recognized by the majority, there was also "an inherent risk of prejudice in admitting evidence of payment of workers' compensation benefits because the receipt of benefits could suggest to the jury that a third party determined that the [Kellys' dog] was the cause of the injury." During opening argument, David's counsel emphasized that (1) David was a Federal employee, (2) the Federal government paid "a reduced rate of his average part-time weekly wage for [the] two years that he was out of work," and (3) "the [F]ederal government paid all of his medical expenses that [were] related to the treatment for the wrist." David then testified to those facts on direct examination. [Note Dissent-3] In closing, David's counsel again emphasized that the Federal government "paid [all of David's] medical expenses, paid his lost wages for the two years he was out of work." The insinuation, which may have swayed the jury, was that the Federal government determined that David's injuries were all caused by the Kellys' dog and that the jury could use that information in reaching their verdict.

 Nonetheless, David argued that juries usually know about 

 Page 456 

workers' compensation benefits and that he needed to introduce the collateral source evidence so the jury would not be "misled into thinking he [was] seeking a double recovery in this matter." The trial judge agreed and stated that it was better to be "more realistic" with juries. [Note Dissent-4] But the desire to be more realistic with juries is "antithetical to the reason why [collateral source evidence] is inadmissible as a general rule." Antoniadis, 99 Mass. App. Ct. at 177 (discussing corollary rule that party's insurance coverage is inadmissible). "As discussed above, the rules regarding the inadmissibility of [collateral source evidence] exist so that juries will not be swayed by" irrelevant and prejudicial evidence. Id. Based on the foregoing, I agree with the majority's conclusion that the collateral source evidence was admitted in error. See id. at 178 ("where the judge's decision was not based on a valid evidentiary need, but was instead based on a legally irrelevant concern," "judge made a clear error of judgment in weighing the factors relevant to the decision" [citation omitted]).

 However, while the majority concludes that the admission of the collateral source evidence did not affect the Kellys' substantial rights, and that they are not entitled to a new trial, I would conclude otherwise. It is true that "[t]he admission of incompetent evidence is not ground for a new trial if before the case is given to the jury they are instructed to disregard it." Allen v. Boston Elevated Ry., 212 Mass. 191, 194 (1912). But there is an exception to this rule: the "rule is not to be applied if it appears that real damage has been done to the excepting party or that the incompetent evidence was not sufficiently withdrawn from possible consideration by the jury." Id. See Masters v. Khuri, 62 Mass. App. Ct. 467, 471 (2004) ("mere offer of evidence in open court on a controversial subject may create a prejudice to the objecting party which it is difficult to eradicate by curative instructions" [quotation and citation omitted]). Cf. Fyffe v. Massachusetts Bay Transp. Auth., 86 Mass. App. Ct. 457, 475 (2014)

 Page 457 

 (addressing attorney misconduct, "rubric that jurors are presumed to follow the judge's instructions does not mean that a curative or cautionary instruction always suffices").

 Real damage was done where the evidence in this case was very close, much closer than the majority acknowledges, and the collateral source evidence went to the heart of the case, and the evidence was likely effective for the very reason it should have been excluded. David testified that the Kellys' dog "came at [him]," "latched on [his wrist] essentially as far back in its jaw that you can get at," and "shook [his wrist] violently for about five to ten seconds." The Kellys disputed this account and, in particular, that their dog violently shook David's wrist. While the Kellys did not witness the incident, they marshalled other evidence in support of their position, including Donna Kelly's testimony that David did not tell her about the injury to his wrist, the photograph showing a tooth-sized indentation but no broken skin to the area, and the lack of clinical findings such as swelling. [Note Dissent-5]

 Each side also retained an expert, and the experts disagreed as to causation. David's expert opined that there were tears to David's triangular fibromyalgia cartilage complex ligament (TFCC) and scapholunate ligament that were caused by the Kellys' dog. David's expert explained that (1) "age-related degenerative tears of the TFCC . . . don't just occur in [thirty year old] patients," (2) "the way that [David] described how he got rid of the dog could very easily have caused that kind of an injury," [Note Dissent-6] and (3) the tears were not severe enough that he would have expected to see swelling. The Kellys' expert disagreed. He testified that thirty percent of patients who are less than thirty years old will show some abnormality to the TFCC and that he did not find "an association with a presumed TFCC tear and the injury sustained" by David. The Kellys' expert based his opinion on the lack of clinical findings and further explained that when someone suffers a TFCC tear as a result of trauma -- versus as a result of regular degeneration -- "we see early on, within hours, swelling, restricted 

 Page 458 

motion, [and] significant tenderness to examination."

 Even the medical records contained conflicting evidence. There was evidence, for example, of magnetic resonance imaging scans (MRI) that were interpreted differently by a surgeon and two radiologists. The surgeon read at least one MRI as showing a tear, but the radiologists concluded otherwise. Moreover, while arthroscopic surgery was performed during which the tear was identified, the tear was not the full-thickness tear that one would have expected to see considering David's stated level of discomfort. Rather, the tear was "partial-thickness." [Note Dissent-7]

 While the majority relies on the fact that this case was a battle of the experts in which "the nature and cause of the injuries to David's wrist were vetted extensively at trial," I think those considerations weigh in favor of a new trial. The jury were presented with two different expert opinions, both of which came from respected doctors [Note Dissent-8] and were grounded in the evidence. In these circumstances, the collateral source evidence, which the jury may have perceived as corroborating David's expert, may have been the piece of evidence that caused the jury to credit David's expert. See, e.g., Torre v. Harris-Seybold Co., 9 Mass. App. Ct. 660, 665 (1980) (in close case involving "duel of experts," collateral source evidence may have been what "eased the jury towards [their] verdict").

 Nor was the collateral source evidence sufficiently withdrawn from possible consideration by the jury. David's workers' compensation benefits were mentioned in opening arguments and then testified to, "freighted with innuendo and left without explanation." Goldstein, 364 Mass. at 810. Only after the close of evidence did the trial judge instruct on the law pertaining to collateral source evidence, including that the jury could not consider the collateral source evidence for the purpose of determining causation. These instructions did not acknowledge any error in the admission of the evidence or require the jury to disregard the evidence in its entirety, as curative instructions typically do, and were instead explanatory instructions given for the purpose of facilitating the admission of the evidence. [Note Dissent-9] Contrast, 

 Page 459 

e.g., Gartland v. Freeman, 277 Mass. 520, 522-523 (1931) (judge acknowledged error, struck evidence, and instructed jury to disregard it); Harris-Lewis v. Mudge, 60 Mass. App. Ct. 480, 489-490 (2004) (same).

 The majority relies heavily on Harris-Lewis, but the circumstances surrounding the admission of the collateral source evidence in Harris-Lewis were very different from the circumstances surrounding the admission of the collateral source evidence in this case. In Harris-Lewis, 60 Mass. App. Ct. at 487-488, potentially relevant evidence was admitted de bene despite being prejudicial of a collateral issue; in this case, wholly irrelevant evidence was admitted despite being highly prejudicial of the main issue. Then, the trial judge in Harris-Lewis gave a forceful curative instruction to disregard the evidence, id. at 488-490, whereas the trial judge in this case gave an explanatory instruction on the law pertaining to collateral source evidence. In my opinion, there is a significant difference between a curative instruction designed to remedy an error, as occurred in Harris-Lewis, and an explanatory instruction designed to facilitate an error, as occurred here. [Note Dissent-10]

 Where the erroneously admitted evidence was so highly prejudicial, went to the heart of a very close case, and was likely effective for the very reason it should have been excluded, I respectfully disagree with the majority's conclusion that the Kellys are not entitled to a new trial.

FOOTNOTES
[Note 1] Donna Kelly. 

[Note 2] Since the defendants share the same last name, we refer to Donna Kelly by her first name. 

[Note 3] The second MRI was performed with contrast dye, to which he had a severe reaction. 

[Note 4] The cause of the leg injury was not disputed. 

[Note 5] "Massachusetts common law defines waiver as the 'intentional relinquishment of a known right.'" Dynamic Mach. Works, Inc. v. Machine & Elec. Consultants, Inc., 444 Mass. 768, 771 (2005), quoting Doujotos v. Leventhal, 271 Mass. 280, 282 (1930). 

[Note 6] Other jurisdictions treat high-low agreements as a conditional settlement. These cases hold that where the jury verdict is within the limits of the agreement, the high-low agreement does not come into play. See Cunha v. Shapiro, 42 A.D.3d 95, 98-99 (N.Y. 2007) (high-low agreement is conditional settlement which comes into play when verdict is rendered outside agreed-upon range); Rodriguez v. Villarreal, 314 S.W.3d 636, 642-643 (Tex. App. 2010) (high-low agreement controls only if verdict falls outside its limits). Because we have decided this case on other grounds, we do not consider these cases. 

[Note 7] "[A] judge's discretionary decision constitutes an abuse of discretion where we conclude the judge made 'a clear error of judgment in weighing' the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014). 

[Note 8] "I know that traditionally and historically parties have requested and courts have allowed that no mention of insurance goes before the jury. But there is a trend, which I think is appropriate, to be more realistic about informing juries about facts to avoid improper speculation. And this is such a situation. So I'm going to allow the motion and give the instruction. Your objection is noted and your rights are saved." 

 In her opening statement, the plaintiff's counsel stated that the Federal government had paid all of David's medical expenses "related to the treatment for the wrist" as well as reduced wages for the two years that he was out of work, and that he would have "to pay that money back from whatever the verdict is in this case." David testified that he received the benefits. No medical bills were offered in evidence. Similar representations were made in closing argument.

[Note 9] In addition, evidence of what medical bills a third party has paid is generally excluded, as it undermines the collateral source rule. See Law, 457 Mass. at 356. Law addressed methods by which medical damages may be proved. It teaches us that actual dollar amounts of medical bills may also be "a temptingly easy, albeit legally misleading, path to follow in arriving at an award of medical damages." Id. at 361 n.17. The $57,318 figure offered at trial was based on the total amount paid for both lost wages and medical bills, not the higher amount originally billed by medical providers, and the defendants did not make any argument at trial or on appeal that the type of evidence permitted by Law should have been admitted, presumably because the plaintiff had already agreed to the lower figure. 

[Note 10] The Kellys posit that the jury were focused on the third-party payment because they asked a question about the breakdown of the medical expenses. The judge had instructed the jury to determine the reasonableness of the medical expenses, but had not realized that the medical bills were not in evidence. There was evidence regarding David's wage rate and time out of work from which the jury could back out the medical portion of the payment. With the agreement of the parties, the judge returned the jury's question with a notation that "the [c]ourt cannot answer any questions of fact." 

[Note Dissent-1] While this case was the inverse of the usual collateral source case, the same well-known evidentiary considerations applied: the trial judge had to determine whether the evidence was relevant and, if so, whether its probative value outweighed its prejudicial effect. See Bank v. Thermo Elemental Inc., 451 Mass. 638, 670 (2008) ("Relevant evidence is admissible unless unduly prejudicial," which requires "weighing the probative value of evidence against any prejudicial effect it might have on a jury" [citation omitted]). 

[Note Dissent-2] David testified that he was never examined by a doctor on behalf of the workers' compensation carrier but that "a nurse . . . called me a couple of times. She reviewed I think a couple of files the doctors had sent over." There was no evidence whether the nurse, or someone else, made the determination regarding David's eligibility for workers' compensation benefits. 

[Note Dissent-3] David further testified that the reduced rate of pay he received was insufficient to sustain a family. To the extent David sought to introduce evidence of his workers' compensation benefits to show he had no financial motivation to remain out of work, this was a nonissue at trial. The Kellys did not argue or introduce evidence that David was malingering because he was receiving workers' compensation benefits. Moreover, assuming that evidence of David's financial difficulties was probative of an issue at trial, he could have testified generally regarding those difficulties without disclosing that he was receiving workers' compensation benefits. 

[Note Dissent-4] The trial judge stated that "there is a trend" in this direction. But the referenced trend pertains only to jury instructions. A judge may instruct a jury not to speculate whether the plaintiff has received collateral source income and not to reduce the jury award based on any such improper speculation. See Law v. Griffith, 457 Mass. 349, 361 (2010) (acknowledging that jury instructions may need to be modified to explain that "whether the plaintiff's medical expenses were paid by her, covered by insurance, or otherwise paid on her behalf, is not relevant to the jury's task"). I thus agree with the majority's analysis that the trial judge could have instructed the jury regarding David's obligation to repay collateral source income. 

[Note Dissent-5] In closing, the Kellys' counsel urged the jury to apply their common sense and to "conclude that the accident did not happen the way [David] explained it." 

[Note Dissent-6] When David's expert took David's history, David reported that he had to "[v]iolently throw his arm around until the dog let go." On cross-examination, David's expert admitted it was "odd" that someone who has to flail his arm to extract it from a large dog's mouth would suffer only a minor external injury of the sort David suffered. In closing, the Kellys' counsel also argued that this description of the incident was inconsistent with the description that David gave at trial, which was that the dog shook David's wrist. 

[Note Dissent-7] David's expert explained that "the TFCC is a round disc that has some thickness to it. And a full-thickness tear means that when you look inside, you can actually see through it." 

[Note Dissent-8] Each expert testified that the other was respected. 

[Note Dissent-9] The majority asserts that the jury instructions specified the purpose for which the evidence could and could not be considered, which would be consistent with a limiting instruction. I disagree with this characterization. The instructions informed the jury how the court would use the collateral source evidence and then instructed the jury not to use that evidence in determining causation. There was no instruction regarding any purpose for which the jury could consider the collateral source evidence. 

[Note Dissent-10] Holding the latter curative would eviscerate the rules of evidence and permit trial judges to admit whatever evidence they desire, so long as they also instruct juries on the law pertaining to the erroneously admitted evidence. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.