SUPREME JUDICIAL COURT 
 
 STEVEN LUPPOLD vs. SUSAN HANLON & others[1]

 
 Docket:
 SJC-13577
 
 
 Dates:
 October 7, 2024 - January 3, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Medical Malpractice, Appeal, Relief from judgment. Negligence, Medical malpractice, Causation. Contract, Settlement agreement. Evidence, Cross-examination, Bias. Witness, Cross-examination, Bias. Practice, Civil, Instructions to jury, Interest, Waiver. Interest. Damages, Interest. Judgment, Relief from judgment, Interest. Waiver.
 
 

       Civil action commenced in the Superior
Court Department on May 5, 2016.
      The case was tried before C. William
Barrett, J., and a motion for judgment notwithstanding the verdict, to set
aside the verdict and order a new trial, or for remittitur was heard by him.
      The Supreme Judicial Court granted an
application for direct appellate review.
      Myles W. McDonough (Christopher M. Reilly
also present) for Susan Hanlon.
      Adam R. Satin (Robert M. Higgins
&  Peter A. Ghattas also present) for
the plaintiff.
      KAFKER, J. 
A jury awarded the plaintiff, Steven Luppold, $20 million in this
medical malpractice case after finding the negligence of three of the
defendants -- Susan Hanlon, a registered nurse (RN); Charles Loucraft, a
physician assistant (PA); and Carlos Flores, a nurse practitioner (NP) --
caused an above the knee amputation of his left leg.  On appeal, the defendant, Hanlon, claims that
the trial judge abused his discretion in not allowing cross-examination
regarding a "high-low" settlement agreement entered into by Loucraft
and Flores, who both testified at trial.[2] 
Hanlon also takes issue with parts of the jury instruction given on
factual causation, contending they did not comply with our decision in Doull v.
Foster, 487 Mass. 1 (2021).  In addition,
Hanlon challenges the trial judge's denial of a motion for judgment
notwithstanding the verdict and seeks to invalidate the assessment of
prejudgment interest on damages awarded to the plaintiff for future pain and
suffering.
      For the reasons discussed infra, we
discern no abuse of discretion in the trial judge's decision not to allow
cross-examination on the high-low settlement agreement, and we find no error in
the jury instruction given on factual causation or the trial judge's denial of
the motion for judgment notwithstanding the verdict.  Finally, we uphold the award of prejudgment
interest.
      1. 
Factual background.  We summarize
the facts that could have been found by the jury, reserving certain facts for
later discussion of the legal issues to which they particularly relate.  The plaintiff, then thirty-five years old,
visited the emergency department (ED) of Lowell General Hospital (Lowell) on
March 7, 2015.  The plaintiff told the
staff member at the registration desk that his foot was painful, cold, and
turning blue.  The plaintiff was then
evaluated by a triage nurse, Carla Crocker, RN. 
As triage nurse, Crocker evaluated patients to determine whether they
should be seen in the "primary" part of the ED -- the side for more
serious cases, which is staffed by physicians -- or the "ambulatory"
part of the ED, for less acute cases. 
The plaintiff told Crocker that he had back pain and numbness in his
left leg and that his left foot was cool to the touch, painful, and turning
blue.  Crocker requested the plaintiff
remove his shoe and sock, felt the plaintiff's foot, and asked the plaintiff if
he had stuck his foot in a snowbank, which the plaintiff denied doing.  Crocker determined that the plaintiff would
be seen by a provider from the "ambulatory" side of the ED.  Several minutes later, the plaintiff was seen
by Loucraft, who did not read the triage note written by Crocker before or
during his evaluation.  Loucraft
reportedly did a physical examination of the plaintiff, including his
foot.  Loucraft described the plaintiff's
skin as warm.  Loucraft diagnosed the
plaintiff with sciatica, prescribed a number of pain medications and muscle
relaxants, and told the plaintiff someone else would come in and discharge
him.  
      Hanlon discharged the plaintiff shortly
thereafter.  Hanlon summarized the
following for the plaintiff:  he had come
in with a blue foot, no testing had been done, and the plaintiff was being
discharged.  The plaintiff stated that
his foot was still swollen and purple and asked Hanlon whether that made a
difference.  Hanlon responded that the
plaintiff would be discharged anyway and provided him patient education
materials.  Both Hanlon and the plaintiff
then signed the discharge paperwork.
      Five days later, on March 12, the
plaintiff called his primary care provider, Lahey Hospital & Medical Center
(Lahey).  When a doctor from Lahey
returned his call the next day, the plaintiff described his March 7 visit to Lowell
and reported left foot discoloration and persistent numbness.  The doctor encouraged the plaintiff to go to
the nearest ED immediately to be evaluated.
      On that day, March 13, the plaintiff again
visited the Lowell ED.  The plaintiff was
brought into the ED in a wheelchair by a friend, and the plaintiff reported at
registration that he had left foot pain. 
The plaintiff was then evaluated by Stefanie Busa, RN, a triage
nurse.  The plaintiff told Busa his back
and upper leg pain had improved but that he had "severe" pain in his
left ankle and that he had run out of muscle relaxants.  Busa examined the plaintiff's bare foot,
which was discolored and swollen, and ultimately assigned him to the ambulatory
side of the ED.  
      On the ambulatory side, Hanlon did an
initial assessment of the plaintiff, and a few minutes later, the plaintiff was
evaluated by Carlos Flores, NP.  The
plaintiff was in a great deal of pain and had difficulty concentrating, so his
friend frequently spoke on his behalf during the evaluation.  Flores did not read the triage note made by
Busa, review the records from the plaintiff's March 7 visit, or examine the
plaintiff's foot.  Flores diagnosed the
plaintiff with radiculopathy, peripheral edema, chronic low back pain, and
hypertension.  Shortly thereafter, Flores
saw the patient a second time to discuss his high blood pressure and prescribed
pain medication, muscle relaxants, and high blood pressure medication.  Hanlon again discharged the plaintiff with
patient education materials related to these conditions.
      On March 17, the plaintiff called Lahey
and reported that his left foot was intermittently painful, numb, discolored,
and cool to the touch.  Lahey scheduled
the plaintiff for an evaluation that same afternoon.  Dr. Robert Brew examined the plaintiff's foot
and ordered an ultrasound.  Brew
diagnosed the plaintiff with arterial thrombosis and deep vein thrombosis, and
Brew himself walked the plaintiff to the ED in a wheelchair, where the
plaintiff was admitted.  On the next day,
March 18, the plaintiff underwent an above-the-knee amputation of his left leg.

      2. 
Procedural history.  On March 16,
2018, the plaintiff filed an amended complaint alleging that Crocker, Busa,
Loucraft, Flores, and Hanlon had failed to satisfy the applicable standards of
care with respect to detecting and treating his blood clots and that his
amputation was the result of their negligence.[3]  
      A jury trial was held in the Superior
Court from March 7 to March 24, 2023. 
The plaintiff's nursing expert, Susan Smith, a doctor of nursing
practice, testified that Hanlon fell below the standard of care of the average
ED nurse on March 7 when she failed to tell Loucraft about the plaintiff's foot
pain and discoloration, which can signal a very serious condition.  Smith testified that Hanlon again fell below
the applicable standard of care on March 13 when she failed to conduct
"[a] pulse evaluation and a further evaluation of the foot," ankle,
and leg, and failed to communicate with the mid-level provider, Flores, before
discharging the plaintiff.  Loucraft
testified that he was not aware that the plaintiff had complained of left foot
pain and discoloration because he had not read the triage note generated by
Crocker.  Loucraft further testified that
had Hanlon reported those complaints to him, he would have treated the symptoms
as a clot "until . . . prove[n] otherwise" and either
ordered an ultrasound or alerted an attending physician.  The plaintiff's emergency medicine expert
likewise testified that the care provided to the plaintiff by both Loucraft and
Flores fell below the relevant standards of care.  After the conclusion of the plaintiff's
case-in-chief, Hanlon, Crocker, and Busa moved for a directed verdict, which
the trial judge denied.  Hanlon's nursing
expert testified that Hanlon acted within the standard of care as discharge
nurse on both visits and when she evaluated the plaintiff during the March 13
visit.  The nurses renewed their motion
for a directed verdict at the close of the evidence, which the trial judge
again denied.
      At the charge conference, the defendants
objected to the use of the term "impact" in the model jury
instructions on factual causation and proposed revisions that would eliminate
such language.  The trial judge denied
this request, opting instead to give a jury instruction that both tracked the
model jury instructions and included additional language employed by the judge
in a prior medical malpractice case.  The
defendants renewed their request for the revised jury instruction after the
parties gave closing arguments and the jury were instructed, but were
unsuccessful. 
      On March 24, the jury returned a verdict
against Hanlon, Loucraft, and Flores, in the amount of $20 million.  Prejudgment interest was applied to the
verdict to yield a total judgment of $28,870,400.  Hanlon subsequently moved for judgment
notwithstanding the verdict, to set aside the verdict and order a new trial, or
for remittitur.  After a hearing, the
trial judge denied Hanlon's motion.
      Hanlon timely appealed from the judgment
entered against her and the trial judge's order denying her posttrial
motion.  We allowed Hanlon's application
for direct appellate review.
      3. 
Discussion.  Hanlon claims she is
entitled to relief based on several alleged errors by the trial judge.  We consider each claim in turn.
      a. 
The high-low agreement.  Hanlon
contends that the judge erred by not allowing her counsel to cross-examine
Loucraft regarding a high-low settlement agreement Loucraft entered into during
trial.  A high-low agreement caps a
defendant's liability while ensuring that the plaintiff receives a minimum
payment amount, regardless of the outcome. 
See David v. Kelly, 100 Mass. App. Ct. 443, 446 (2021); Serico v.
Rothberg, 234 N.J. 168, 172 (2018).[4]
      In the instant case, we have been
presented with no details regarding the terms of the high-low agreement.  What we do know is that at some point after
Loucraft testified for the first time, but before Loucraft took the stand in
his own case-in-chief, both he and Flores entered into a high-low agreement
with the plaintiff.  When Loucraft retook
the stand, Hanlon's counsel sought to cross-examine Loucraft about the high-low
agreement.  The following sidebar then
took place:
Counsel for
Hanlon:  "The reason I asked to be
seen, Your Honor, is that the original, more the prior testimony in getting him
to [sic] bias of this witness and giving those opinions against the nurses
because of his circumstance with his [insurance] company and with a high-low
agreement I'd like to be able to inquire of that."
The judge:  "He gave this testimony at a deposition
three years before any high-low agreement?"
Plaintiff's
counsel:  "I don't even know what
the high-low agreement is about, but I don't think that's relevant in any way."
      The judge: 
"I'll let [counsel for Loucraft] --"      
Counsel for
Loucraft:  "Yeah, I don't either,
Your Honor.  I don't know what the
relevance is.  I mean, his testimony's
been consistent with what he said in his deposition.  None of it's different."
Counsel for
Hanlon:  "It is different from the
deposition, and it's changed because of [sic] the insurer is bankrupt."
Counsel for
Loucraft:  "Wait a minute.  Well, then, I think you have a right to
cross-examine him if he says something different on his examination[.]  [T]he insurers just so the record's clear . .
. rehabilitation is not bankrupt."
Counsel for
Hanlon:  "Right."
Counsel for
Loucraft:  "And yeah, I mean, there
is.  There's a high-low agreement.  I don't -- I'm certainly happy to share that
with the court, but --" 
The judge:  "We're not going to get into any of
that."  
Counsel for
Loucraft:  "Yeah, and I wouldn't ask
that you should."  
The judge:  "And I don't think they're going
to[.]" 
      On appeal, Hanlon seeks to flesh out the
basis for such cross-examination.  She
argues that she should have been allowed to cross-examine Loucraft regarding
bias caused by the high-low agreement. 
That bias, she contends, is evident in Loucraft's changed testimony, although
she did not provide any specifics on how his testimony changed to the trial
judge at sidebar or at any time during trial.[5]  Further, she asserts, albeit only in her
posttrial motion and appellate brief, that precluding cross-examination caused
her actual prejudice because her counsel was unable to explain why the
plaintiff was motivated to alter his testimony and why plaintiff's counsel was
motivated to "vilify" Hanlon and praise a settling codefendant during
his closing argument.[6]  We disagree. 
      "We review a trial judge's
evidentiary decisions under an abuse of discretion standard."  N.E. Physical Therapy Plus, Inc. v. Liberty
Mut. Ins. Co., 466 Mass. 358, 363 (2013). 
"[A] judge's discretionary decision constitutes an abuse of
discretion where we conclude the judge made a clear error of judgment in
weighing the factors relevant to the decision such that the decision falls
outside the range of reasonable alternatives" (citation and quotation
omitted).  L.L. v. Commonwealth, 470
Mass. 169, 185 n.27 (2014).  The test
when evaluating whether the exclusion of evidence rises to prejudicial error is
"whether the proponent of erroneously excluded, relevant evidence has made
a plausible showing that the trier of fact might have reached a different result
if the evidence had been before it." 
DeJesus v. Yogel, 404 Mass. 44, 48-49 (1989).
      The general rule is settlement agreements
are not admissible to "prove either liability or the amount of a
claim."  Morea v. Cosco, Inc., 422
Mass. 601, 604 (1996).  See Mass.
G. Evid. § 408(a) (2024).  This
is the general rule because settlement of litigation is to be encouraged, and
disclosing such agreements risks skewing jurors' required analysis of the
parties and their respective liability, leading jurors, for example, to
consider such settlement agreements as an admission of liability or
alternatively to conclude that a liability determination is not necessary
because the injured plaintiff has already been compensated.  See, e.g., Zucco v. Kane, 439 Mass 503, 509
(2003) (evidentiary rule precluding offers and acceptance of settlement
agreements is "designed to encourage settlements by limiting the
collateral consequences of a decision to compromise"); Cottam v. CVS
Pharmacy, 436 Mass. 316, 328 (2002) (affirming admission of agreement but
noting "admission of this evidence created the risk that the jury would
perceive the settlement by [a party that settled before trial] as an admission
of his liability"); Morea, supra (general rule barring disclosure of
settlements to prove liability or amount of claim "will tend to encourage
a plaintiff to settle with one tortfeasor, knowing that the case against
another tortfeasor will not be prejudiced by evidence of the settlement").  Evidence of settlement agreements may, however,
in appropriate circumstances, be admitted to demonstrate that a testifying
witness "may have harbored bias" against a party.  Cottam, supra.
In
the instant case, it appears Hanlon sought to cross-examine Loucraft regarding
the high-low agreement, claiming it biased him and caused him to change his
testimony.  How his testimony changed, or
why it would change based on a high-low agreement, is, however, not in any way
evident based on the trial court record. 
Loucraft had previously testified in a deposition and earlier at trial,
both prior to entering into the agreement. 
When confronted with the trial judge's assertion that Loucraft had
testified to the same thing in his deposition years prior, Hanlon's counsel
responded only with the conclusion that "[i]t is different from the
deposition, and it's changed because of [sic] the insurer is bankrupt."[7]  
In
fact, the record before us shows no such material change in Loucraft's
testimony.[8]  Loucraft consistently
testified -- both before he entered into the high-low agreement and later in
his own case-in-chief, after he entered into the high-low agreement -- that the
nurses bore responsibility for communicating important information about the
plaintiff to him, and that he would likely have ordered follow-up testing if
Hanlon had informed him that the plaintiff's foot was discolored and cold.  The only instance in which his testimony did
change –- he testified on March 10, 2023, that he did not recall whether he
read the triage note, but admitted on March 21 that he did not review it –-
involved Loucraft taking full responsibility for his own error, rather than
shifting blame to Hanlon.  
At
no point did Hanlon's counsel make an offer of proof, request a voir dire of
the witness, identify for the court any specific instances of changed
testimony, or explain how the existence of a high-low agreement would be
relevant to the alleged changes.  We do
not even know the terms of the high-low agreement in this case or whether they
were unusual in any respect.  Such
agreements often simply cap liability to the amount of insurance.  See, e.g., David, 100 Mass. App. Ct. at 446
(agreement guaranteed plaintiff between $150,000 and $1 million, where $1
million was defendants' policy limit); Xu vs. Donovan, Mass. Super. Ct., No.
1584CV01625BLS2 (Suffolk County June 2, 2017) (agreement guaranteed at least
$300,000 but no more than $2.5 million, defendants' insurance cap, from each
defendant); Wright vs. Kelleher, Mass. Super. Ct., No. 021589A (Worcester County
Sept. 10, 2008) (agreement set "low" and "high" at $1.3
million, defendant's policy limit).[9]
In
sum, Hanlon failed to demonstrate that the general rule against admission of
settlement evidence should not apply in the instant case.  The existence of a high-low settlement
agreement of unknown terms does not alone establish bias. 
Hanlon
also attempts to turn this evidentiary issue into a constitutional one,
claiming her inability to cross-examine regarding the high-low agreement
violated her right to a jury trial provided in art. 15 of the Massachusetts
Declaration of Rights.  She contends this
right was violated when she was denied the ability to cross-examine regarding
bias.  Of course, Hanlon's counsel did
cross-examine Loucraft, and was allowed to explore bias in other respects, just
not in regard to the high-low agreement, for the reasons discussed above.  None of the cases Hanlon cites supports her
suggestion that precluding cross-examination regarding a high-low settlement
agreement violates any constitutional rights in these circumstances.  Cf. Commonwealth v. Sealy, 467 Mass. 617, 624
(2014) (constitutional right to confront and cross-examine witnesses in
criminal case is "not absolute . . . .  A defendant must make a plausible showing of
alleged bias, with a factual basis for support" [quotation and citations
omitted]).
Nor
are we persuaded by Hanlon's argument that the majority of other jurisdictions
allow at least some cross-examination on high-low settlement agreements.  Many of the cases on which Hanlon relies
involve "Mary Carter agreements," in which defendants who enter into
such agreements and remain in the case not only "guarantee the plaintiff a
certain minimum monetary recovery regardless of the outcome of the lawsuit,
[but also] have their liability reduced in direct proportion to the increase in
the liability of the nonagreeing defendant or defendants."  Kippenhan v. Chaulk Servs., Inc., 428 Mass.
124, 131 (1998).  A settlement agreement
directly incentivizing and rewarding blame-shifting is different from a
settlement agreement that only defines a minimum and maximum recovery.  Although codefendants often have some
incentive to deflect responsibility, Mary Carter agreements establish a direct
payment mechanism that rewards such blame-shifting, dollar for dollar.  Such agreements raise a markedly different
set of concerns.[10]   
In
the instant case, Hanlon has not provided any evidence that the high-low
agreement provided any such incentive. 
As explained above, she did not request a voir dire, or make an offer of
proof suggesting such untoward financial blame-shifting incentive.
      For all these reasons, we discern no
abuse of discretion by the trial judge in denying cross-examination on the
high-low agreement in these circumstances. 
      b. 
Jury instructions.  On appeal,
Hanlon renews her argument that the jury instruction given by the trial judge
regarding factual causation was erroneous in light of our decision in Doull,
487 Mass. 1.  "We review objections
to jury instructions to determine if there was any error and, if so, whether
the error affected the substantial rights of the objecting party"
(citation omitted).  Dos Santos v.
Coleta, 465 Mass. 148, 153-154 (2013). 
"'A trial judge has wide latitude in framing the language to be
used in jury instructions' as long as the instructions adequately explain the
applicable law."  Kelly v. Foxboro
Realty Assocs., LLC, 454 Mass. 306, 316 (2009), quoting Jacobs v. Pine Manor
College, 399 Mass. 411, 414 (1987).  In
making this determination, we consider "the adequacy of the instructions
as a whole, not by fragments." 
Doull, supra at 6, quoting DaPrato v. Massachusetts Water Resources
Auth., 482 Mass. 375, 383 n.11 (2019).
At
trial, the judge gave the following instruction to the jury as to factual
causation:
"The
defendant caused injuries if the injuries would not have occurred without, that
is but for, that defendant's negligence. 
To decide this, you must ask would the same harm have happened without
that defendant's negligence.  In other
words, did the negligence make a difference?
"If a
defendant's negligence had an impact on Steven Luppold's injuries, then it
caused those injuries.  But if the
negligence had no impact on Steven Luppold's injuries and the result would have
happened anyway, then that defendant did not cause the injuries."
This language
largely tracked that of the Superior Court's model jury instruction on
causation adopted after our decision in Doull.[11]  See Superior Court Model Jury Instructions,
Medical Malpractice 6-8 (May 2021).
In
Doull, 487 Mass. at 16-17, we adopted the revised approach to causation in the
Restatement (Third) of Torts and determined that, in "negligence cases
involving multiple alleged causes of the harm" such as this case, "a
but-for standard, rather than a substantial factor standard, is the appropriate
standard for factual causation." 
See Greene v. Philip Morris USA Inc., 491 Mass. 866, 875-877 (2023); Restatement
(Third) of Torts:  Liability for Physical
and Emotional Harm §§ 26 comment j, 27 comment b (2010).  Among our motivating concerns in doing so was
the risk that, under the substantial factor test, the jury could alternatively
apply a "more demanding standard than a traditional but-for standard"
or "skip the factual causation inquiry altogether."  Doull, supra at 14-15.  We therefore assess whether the jury
instructions in this case properly imparted "but-for" causation to
the jury.
Hanlon
argues that the jury instruction violated Doull by expanding factual causation
to include "two separate things," one being "but-for"
causation and the other being "impact" in some other respect.  What that other respect might be is,
unfortunately, unclear, although Hanlon suggests "impact" could mean
that the negligence may have some "effect" or "impression,"
such as making the harm "more likely."  In particular, she focuses on the sentence in
the instructions that provided:  "If
the negligence had no impact on [the plaintiff's] injuries and the result would
have happened anyway, then that defendant did not cause the
injuries."  She emphasizes that the
word "and" to separate the clauses in this sentence conveyed two
different concepts of factual causation. 
We disagree.
Hanlon's
interpretation ignores the instructions as a whole, which conveyed a
"but-for" causation requirement as explained in Doull, 487 Mass. at
6, citing DaPrato, 482 Mass. at 383 n.11. 
See Laramie v. Philip Morris USA Inc., 488 Mass. 399, 417 (2021)
("We do not review an individual instruction in isolation"); Selmark
Assocs. v. Ehrlich, 467 Mass. 525, 547 (2014). 
The jury instructions given immediately before the sentence at issue
more than sufficiently communicated the necessity and meaning of "but-for"
causation.  The preceding two sentences,
for example, explicitly used the term "but-for" and employed language
approved of and used in Doull.[12]  See
Doull, supra at 11 n.10, 14-15, 17.  The
sentence at issue, as discussed in more detail below, explained the same
"but-for" causation requirement, using alternative, plain-language
terminology.  When read as a whole, then,
the challenged instructions in this case more than adequately conveyed
"but-for" causation.  See id.
at 6, 16-17.  
We
discern no merit to Hanlon's argument that the sentence she highlights added
another means of proving factual causation. 
Neither the word "impact" nor the word "and," alone
or in combination, supports such an interpretation.  As the plaintiff correctly points out, and as
the model jury instructions reference, see Superior Court Model Jury
Instructions, Medical Malpractice 7 nn.18-19 (Dec. 2024), the inclusion of the
word "impact" tracks language we used in Doull:  "the purpose of [the] but-for standard
is to separate the conduct that had no impact on the harm from the conduct that
caused the harm" (emphasis added). 
Doull, 487 Mass. at 11.  That the
trial judge, in keeping with the model jury instructions, opted to use this
terminology to further explain "but-for" causation in language[13]
that may be more familiar to, and more easily understood by, jurors does not in
any way negate the fundamentally correct legal principle communicated therein.[14]  See Selmark Assocs., 467 Mass. at 547,
quoting Mahoney v. Gooch, 246 Mass. 567, 571 (1923) ("A judge should instruct
the jury fairly, clearly, adequately, and
correctly . . ."); Kelly, 454 Mass. at 316.  See also Massachusetts Superior Court
Guidelines for Drafting Model Jury Instructions, Using the Jury Instruction
Templates, and Adapting Model Instructions for Your Case § 1.1, at 2 (Mar.
2021) (counselling that courts "serve justice better" by providing
instructions "that jurors of all backgrounds can actually absorb and
follow"). 
      The use of the conjunction
"and" in this context also does not suggest two separate means of
proving factual causation.  It is rather
an attempt, again, to use plain language to further clarify the meaning of
"but-for" causation using alternative terminology, such as "no
impact" and "the same harm," more familiar to the average juror.  Although we think this is clear in the
existing jury instructions, we believe a minor revision to the instructions
would make the point even more expressly. 
Accordingly, the sentence at issue in the current model jury
instructions should be modified, as indicated by the underlined text, from:
"If
[defendant's] negligence had an impact on [plaintiff's] 
injuries (by
causing them or worsening them), then it caused those injuries.  But if the negligence had no impact on
[plaintiff's] injuries and the same harm would have happened anyway, then
[defendant] did not cause the injuries." 
to:
"If
[defendant's] negligence had an impact on [plaintiff's] 
injuries (by
causing them or worsening them), then it caused those injuries.  But if the negligence had no impact on
[plaintiff's] injuries, meaning that the same harm would have happened anyway,
then [defendant] did not cause the injuries."
c.  Denial of posttrial motion.  Hanlon raises two other grounds for relief,
which we address briefly here.  First,
Hanlon argues that she was entitled to a judgment notwithstanding the verdict
(judgment n.o.v.) because the plaintiff's theory of recovery required that
Hanlon, an RN, "supervise medical diagnoses and orders," which are
"undertakings that [she] [had] no authority or license to engage in,"
and must instead have been made by more highly credentialed providers "who
[did] have such authority and licensure." 
In Hanlon's view, the jury's verdict against her was inconsistent with
Massachusetts statutes and regulations, which "sharply cabin[]" the
"[s]cope of practice of RNs . . . compared to that of PAs and
NPs."  Second, Hanlon argues that
her duty to the plaintiff lapsed because there was a "shift" in the
plaintiff's care from Hanlon to Loucraft and Flores, who then assumed that duty
during the March 7 and March 13 visits, respectively.  Hanlon takes the position that this transfer
of responsibility for the plaintiff's care operated as a "superseding
intervening cause" and relieved her of liability as a matter of law.  We conclude that neither argument has merit
based on the evidence and arguments presented in the instant case.
"When
considering a motion for judgment n.o.v., the judge's task, taking into account
all the evidence in its aspect most favorable to the plaintiff, [is] to
determine whether, without weighing the credibility of the witnesses or
otherwise considering the weight of the evidence, the jury reasonably could
return a verdict for the plaintiff" (quotation and citation omitted).  Phelan v. May Dep't Stores Co., 443 Mass. 52,
55 (2004).  
As
a threshold matter, the plaintiff contends that Hanlon's first argument is
waived.  The trial judge found as much
when Hanlon argued, for the first time at the hearing on the motion for
judgment n.o.v., that the duty the plaintiff ascribed to Hanlon exceeded her
scope of practice as defined by State law. 
See G. L. c. 112, § 80B; 244 Code Mass. Regs.
§§ 3.00 (2021); 244 Code Mass. Regs. § 9.03(10) (2021).  Even assuming, arguendo, that this issue was
preserved, Hanlon errs by framing the plaintiff's theory as a failure to
supervise mid-level providers.  The
plaintiff's claims did not require that Hanlon "supervise" Loucraft
or Flores or act beyond the scope of her nursing practice.  Instead, the plaintiff's nursing expert
testified that Hanlon should have identified that the plaintiff's complaint was
inconsistent with the diagnosis, asked the plaintiff follow-up questions, and
alerted Loucraft of the plaintiff's symptoms. 
Loucraft likewise testified that Hanlon's failure to bring the
plaintiff's foot pain and discoloration to his attention was "below the
standard of care of a nurse in [the] emergency department."  He further testified that had she brought
this to his attention, he would have ordered an ultrasound.  There was, therefore, ample support in the
record for the plaintiff's claims that Hanlon should have recognized the
clinical significance of the plaintiff's symptoms and alerted the attending
mid-level provider accordingly.  Reviewing
the evidence in the light most favorable to the plaintiff, a "jury
reasonably could return a verdict for the plaintiff."  Phelan, 443 Mass. at 55.
Hanlon's
second argument -- that she is relieved of liability as a matter of law because
the plaintiff's care was transferred to Loucraft and Flores -- is likewise
without merit.  The plaintiff provided
evidence that had Hanlon alerted Loucraft to the plaintiff's complaints of
serious symptoms, Loucraft would likely have taken different steps to evaluate
the plaintiff and that the plaintiff's blood clot would have been identified
earlier, obviating the need for the eventual amputation.  The nursing expert also testified that such
actions were Hanlon's responsibility and failing to communicate with Loucraft
fell below the standard of care of an RN in the ED.  Therefore, under the applicable causation
standard, the jury could reasonably have concluded that Hanlon bore
responsibility for the plaintiff's injuries, even though she was only one of
several providers who saw the plaintiff on each visit.[15]  
d.  Prejudgment interest.  Finally, Hanlon asserts that the trial judge
erred in assessing prejudgment interest on the plaintiff's award for future
pain and suffering under G. L. c. 231, § 60K (§ 60K).  The jury in this case ultimately awarded the
plaintiff $20 million in damages:  $10
million to compensate him for physical pain and suffering, mental pain and
suffering, loss of enjoyment of life and of bodily function, and other items of
general damages from the date of injury to the present; and $10 million to
compensate him for the same damages into the future for thirty-three
years.  Pursuant to § 60K,
prejudgment interest was assessed on the full damages amount and totaled
$8,870,400.  Section 60K states in
relevant part:
"In any
action for malpractice, negligence, error, omission, mistake or unauthorized
rendering of professional services, other than actions brought under
[G. L. c. 229, § 2], against a provider of health care, in which
a verdict is rendered or a finding made or an order for judgment made for
pecuniary damages for personal injuries to the plaintiff or for consequential
damages, there shall be added by the clerk of the court to the amount of
damages interest thereon, at a rate to be determined as set forth below rather
than the rate specified in [G. L. c. 231, § 6B], from the date
of the commencement of the action even though such interest brings the amount
of the verdict or finding beyond the maximum liability imposed by law."
Relying largely
on our holding in Conway v. Electro Switch Corp., 402 Mass. 385, 391 (1988), an
employment discrimination case under G. L. c. 151B involving front pay, Hanlon
argues that the statutory requirement for prejudgment interest does not apply
to the $10 million to compensate the plaintiff for damages into the future,
including the plaintiff's future pain and suffering.
The
plaintiff asserts that Hanlon waived her challenge to the assessment of
prejudgment interest by failing to raise it prior to her appeal.  The $20 million judgment against Hanlon, plus
prejudgment interest, was initially entered on March 28, 2023, and was
reentered with a corrected interest rate on March 30.  The record does not indicate that Hanlon
objected to the assessment of prejudgment interest on the plaintiff's future
damages at either juncture.  In Hanlon's
posttrial motion filed on April 7, 2023, Hanlon moved for remittitur of the
jury's $20 million damages award to the plaintiff on the basis that the
award amount was "grossly excessive" and, in a footnote, challenged
the date from which prejudgment interest was calculated.[16]  She did not, however, contend that
prejudgment interest should not have been assessed on the $10 million dollars
awarded to compensate the plaintiff for damages into the future, nor did her
counsel make this argument at the posttrial motion hearing.
As
the issue whether such damages should have been excluded from the calculation
of prejudgment interest raises a substantive legal question, this argument
should have been presented in the first instance to the trial judge.  In these circumstances, where a substantive
legal issue is presented requiring judicial consideration, the assessment of
prejudgment interest is not simply a "ministerial act" performed by a
clerk.  O'Malley v. O'Malley, 419 Mass.
377, 381 (1995).  Here, however, the
issue was not raised in Hanlon's posttrial motion to challenge the damages
award, including her challenge to the calculation of prejudgment interest.  Ordinarily the failure to raise a legal
argument at the trial level results in its waiver.  Carey v. New England Organ Bank, 446 Mass.
270, 285 (2006) ("An issue not raised or argued below may not be argued
for the first time on appeal" [citation omitted]).  Cf. Greene, 491 Mass. at 877-878 (issue
waived where defendant's counsel "made no substantive objection, or even
reference to his prior objections" regarding jury instructions); Huber v.
Huber, 408 Mass. 495, 497 (1990) (issue not preserved where party argued
written report "itself was inadmissible hearsay" on appeal but, at
trial, had argued report was inadmissible "because it was based on
hearsay"). 
That
said, in the context of prejudgment interest calculations, we have so far only
found waiver when the argument is not raised in an original appeal.  See City Coal Co. of Springfield v. Noonan,
424 Mass. 693, 695 (1997), S.C., 434 Mass. 709 (2001) ("Whatever the
merits of that argument [regarding the calculation of prejudgment interest], it
is too late to make it . . . because the issue was apparent on the
face of the judgment" and therefore "could have been raised" on
defendant's first appeal); Frank D. Wayne Assocs. v. Lussier, 394 Mass. 619,
622 (1985) (declining to decide challenge to prejudgment interest where
"[a]ny errors that the clerk made in computing the interest on the
judgment entered after rescript [were] not in any way distinct from any errors
that the parties could have raised in the initial appeal"); H1 Lincoln,
Inc. v. South Washington St., LLC, 104 Mass. App. Ct. 256, 260-261, review
granted to address question of postjudgment interest, 494 Mass. 1106 (2024)
(prejudgment interest challenge waived where "the application of
prejudgment interest . . . was apparent on the face of the judgments
from which the defendant initially appealed").  As we have not previously clearly found
waiver in the context before us, we exercise our discretion to consider the
argument Hanlon makes here even though it was not presented below.
We
can expeditiously address and resolve the merits of the legal issue Hanlon
presents because the argument she raises here -- that the holding in Conway, a
G. L. c. 151B employment discrimination case in which the court declined to
award prejudgment interest on front pay, should be extended to personal injury
claims -- has previously been rejected. 
See Commonwealth v. Johnson Insulation, 425 Mass. 650, 665-667 (1997)
(rejecting argument to extend Conway to asbestos removal tort case and further
distinguishing, as discussed infra, appropriate prejudgment interest in
personal injury context from that of G. L. c. 151B context).  See also Ayash v. Dana-Farber Cancer Inst.,
443 Mass. 367, 391, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546
U.S. 927 (2005) ("It cannot be said . . . that claims arising
under G. L. c. 151B are causes of action in tort"); Kuppens v. Davies, 38
Mass. App. Ct. 498, 499 (1995) ("We do not concur in the defendants' view
that Conway overruled Carey v. General Motors Corp.[, 377 Mass. 736 (1979),
discussed infra,] sub silentio").  
Section
60K expressly provides that "[i]n any action for malpractice, [or]
negligence, . . . in which a verdict is rendered . . . for
personal injuries to the plaintiff . . . there shall be added by the
clerk of the court to the amount of damages interest thereon . . . from the
date of the commencement of the action." 
In Carey, 377 Mass. at 746, we determined that G. L. c. 231, § 6B, the
corresponding prejudgment interest statute to § 60K for tort actions,
"unequivocally required" that prejudgment interest be calculated on
the plaintiff's entire award, which included damages for loss of future earning
capacity.  See Griffin v. General Motors
Corp., 380 Mass. 362, 367 (1980) (reiterating that § 6B is "unequivocal in
requiring that the clerk add interest on the entire amount of the
verdict").  Carey likewise required
the payment of prejudgment interest on the entire judgment even where, as here,
there was a bifurcation of the jury-awarded damages into past and future
components.  See Carey, supra at 738-739,
746; Kuppens, 38 Mass. App. Ct. at 498, 500 (citing Carey for this proposition
in medical malpractice case, where G. L. c. 231, § 60F, as in this case,
required such bifurcation).  
In
Johnson Insulation, 425 Mass. at 664-665, we were asked to determine whether
the plaintiff was entitled under § 6B to prejudgment interest both on damages
for asbestos removal costs incurred before the judgment and on damages for
abatement projects not yet undertaken. 
The defendant there, relying on Conway, "characterize[d] projected
abatement costs as costs associated with 'future damages,' for which, it
argue[d], prejudgment interest should not be assessed."  Id. at 665. 
The court rejected that argument and the extension of Conway's reasoning
beyond front pay damages in G. L. c. 151B cases.  Noting specifically that damages for loss of
earning capacity in personal injury suits could also not be properly analogized
to Conway, we held: 
"The cost of
asbestos abatement, whether already incurred by the Commonwealth or merely
projected, is not itself the damage or injury suffered by the Commonwealth, but
is rather a measurement of the appropriate compensation for that damage.  See Black's Law Dictionary 389 (6th ed. 1990)
(distinguishing 'damage,' a loss or injury to person or property, from
'damages,' the money compensation for such loss).  The injury to the Commonwealth's property
occurred when asbestos-containing products were installed in its buildings.  Any damages to which the Commonwealth was
entitled, whatever that amount might be and whenever it might be awarded, was
due from the moment of injury. 
See USM Corp. v. Marson Fastener Corp., 392 Mass.
334, 348 (1984) (in the typical tort action, 'damages accrue at the time
of the tortious injury').  The
Commonwealth's projected abatement costs are not 'future damages,' but
are rather an estimation of damage that has already occurred, for which
compensation is already due. . . . Similarly, in the case of
personal injury, prejudgment interest is to be awarded for the loss of earning
capacity, even though it is future income that is affected by that
loss."  (Footnote omitted.)
Id. at
665-667.  See Kuppens, 38 Mass. App. Ct.
at 499-500.  
Hanlon
makes essentially the same argument, seeking to extend the distinct holding in
Conway declining to award prejudgment interest on front pay in a G. L. c. 151B
case.[17]  For the same reasons we
rejected this argument in Johnson Insulation, 425 Mass. at 665-667, we decline
to accept it here.  In a personal injury
case, the relevant statute expressly provides that prejudgment interest should
be assessed on the amount of damages from the injury, and that amount of
damages has been consistently interpreted to encompass the entire award, as all
such damages are determined to arise from the injury itself.
4.  Conclusion. 
We discern no abuse of discretion or error of law in the trial judge's
decision not to allow cross-examination regarding a high-low agreement, his
formulation of jury instructions regarding but-for causation, and his denial of
Hanlon's postverdict motion.  We also
find no error in the calculation of prejudgment interest on the damages awarded
in this case.  Accordingly, the judgment
is affirmed.  The order denying the
motion for judgment notwithstanding the verdict, to set aside the verdict and
order a new trial, or for remittitur is also affirmed.
So ordered.

footnotes

[1] Carlos
Flores, Charles Loucraft, Stefanie Busa, Carla Crocker, and Merrimack Valley
Emergency Associates, Inc.

[2] Hanlon, one
of three defendants found liable for the plaintiff's injuries, is the only
appellant in the instant case.

[3] The original
complaint was filed on May 5, 2016.

[4] While
technically a settlement agreement, a high-low agreement "only mitigates
the risk faced by the litigants -- it saves no time or expense related to
litigation and requires the full panoply of judicial process, up to and
including a jury verdict."  Serico,
234 N.J. at 179.

[5] Counsel for
Hanlon did cross-examine the plaintiff during trial on a change in his
testimony:  at deposition the plaintiff
had explained that he did not remember the details of his discharge, but he
claimed at trial to have told Hanlon that his foot was still swollen and discolored.

[6] In closing,
counsel for the plaintiff asked the jury to "give a lot of credit to
Charles Loucraft," because, when questioned as to whether he should have
read the triage nurse's note, Loucraft "told you he messed up."  Plaintiff's counsel also noted that although
Loucraft "didn't throw anybody under the bus," he also testified
that, had Hanlon "[told] him about a purple, cool foot," he
"would have [ordered] an ultrasound." 
Plaintiff's counsel also called attention to Hanlon's repeated absence
from the proceedings and suggested that the jury could draw a corresponding
inference:  "Maybe it's telling,
kind of the way [she] acted about this case is how [she] acted about [the
plaintiff] in the ED."  In response,
Hanlon's counsel requested a comprehensive curative instruction that parties
not present in the court room were "excused by the court" and, as
such, the jury "should draw no negative inference" from their
absence.  The trial judge, noting that he
had never "excused" anyone, declined to so instruct, and instead gave
the standard charge that "[a] party's presence in the court room or lack
thereof is not evidence."

[7] Counsel for
Loucraft immediately corrected Hanlon's counsel, clarifying that the insurer
was in rehabilitation, not bankruptcy.

[8] In the record
before us, we have only brief excerpts from Loucraft's deposition.  However, in response to Hanlon's posttrial
motion, the trial judge issued a memorandum of decision that noted that
"Loucraft's trial testimony was consistent with his 2019 deposition
testimony."  During the hearing on
Hanlon's posttrial motion, counsel for Hanlon unsuccessfully argued that after
the high-low agreement was in place, Loucraft offered testimony against Hanlon,
while in his deposition, Loucraft only had said "Nurse Hanlon,
apparently," when asked whether anyone else knew of the plaintiff's foot
complaints.  This was the first time
Hanlon identified any specific purported change in Loucraft's testimony for the
trial judge. 

[9] Even if
Hanlon had identified some changes in testimony after the parties entered into
the high-low agreement, and somehow connected those changes in testimony to the
existence of the high-low agreement, the trial judge would still have had to
weigh the probative value of the agreement against the danger of unfair
prejudice.  See, e.g., Gath v. M/A-Com,
Inc., 440 Mass. 482, 490 (2003) (appropriate to exclude evidence where
"its probative value is substantially outweighed by the danger of unfair
prejudice"); Mass. G. Evid. § 403 (2024).

[10] The high-low
agreement cases that Hanlon cites to support her right to cross-examine on such
agreements are also more nuanced than she contends.  They require the trial judge to weigh the value
of admitting that evidence versus the risk of prejudice their introduction may
cause.  See, e.g., Hashem v. Les Stanford
Oldsmobile, Inc., 266 Mich. App. 61, 86 (2005) ("in cases such as this,
the interest of fairness served by disclosure of the true alignment of the
parties to the jury must be weighed against the countervailing interests in
encouraging settlements and avoiding prejudice to the parties"); Slusher
v. Ospital, 777 P.2d 437, 444 (Utah 1989) ("the court shall
. . . disclose the existence and basic content of the agreement to
the jury unless the court finds that . . . such disclosure will
create substantial danger of undue prejudice, of confusing the issues, or of
misleading the jury").

[11]
"Instructions that convey the proper legal standard, particularly when
tracking model jury instructions, are deemed correct."  Commonwealth v. Doughty, 491 Mass. 788, 801
(2023), quoting Green, petitioner, 475 Mass. 624, 629 (2016).  The model jury instruction on causation was,
in relevant part: 
"If you find
that [the defendant] was negligent, then you must decide whether [the
plaintiff] proved that, more likely than not, [the defendant's] negligence
caused [the plaintiff's] injuries (caused [the plaintiff's] injuries to get
worse).  You must ask:  'Would the same harm have happened without
[the defendant's] negligence?'  In other
words, did the negligence make a difference? 
If [the defendant's] negligence had an impact on [the plaintiff's]
injuries, then it caused those injuries. 
But if the negligence had no impact on [the plaintiff's] injuries and
the same harm would have happened anyway, then [the defendant] did not cause
the injuries.
"Often, an
injury has more than one cause.  If [the
defendant's] negligence was one of those causes, that is enough.  [The plaintiff] does not have to show that
[the defendant's] negligence was the only cause of the injuries."  (Footnotes omitted.)
Superior Court
Model Jury Instructions, Medical Malpractice 6-8 (May 2021). 
The trial in this
case took place in March 2023, when the 2021 version of the model jury
instructions on medical malpractice was in effect.  A revised version of the instructions,
published in December 2024, included several minor changes to the quoted
language.  The relevant portion of the
revised instruction states:  "You
must ask:  'Would the same harm have
happened without [the defendant's] negligence?' 
In other words, did the negligence make a difference to the
outcome?  If [the defendant's] negligence
had an impact on [the plaintiff's] injuries (by causing them or worsening
them), then it caused those injuries."

[12] In Doull, we
approved of the trial judge's instruction on causation in fact -- that
"[the] conduct was a cause of the Plaintiff's harm . . . if the
harm would not have occurred absent, that is but for the Defendant's
negligence.  In other words, if the harm
would have happened anyway, that Defendant is not liable" -- as an
appropriate expression of the "but-for" standard.  See Doull, 487 Mass. at 11 n.10, 17.  In our discussion of the approach to
causation in the Restatement (Third) of Torts using traditional
"but-for" causation, which we ultimately adopted in Doull, we also
stated, "If a defendant's conduct was necessary to bring about a harm, and
the harm would not have occurred without the defendant's conduct, that
defendant should be treated as a factual cause of the harm."  Id. at 14-15. 
Language aligning with the approved jury instruction in Doull and with
our opinion in Doull appeared in the jury instruction in this case and is
emphasized in the portion of the instructions reproduced below:     
"The
defendant caused injuries if the injuries would not have occurred without, that
is but for, that defendant's negligence. 
To decide this, you must ask would the same harm have happened without
that defendant's negligence.  In other
words, did the negligence make a difference?"

[13] The drafters
of the model jury instructions noted that the term "but-for" is
"not in common usage among jurors and may raise questions or create
confusion."  Superior Court Model
Jury Instructions, Medical Malpractice 7 n.17 (Dec. 2024).    

[14] We
acknowledge that, as revised in December 2024, the relevant sentence in the
model instruction now states:  "If
[the defendant's] negligence had an impact on [the plaintiff's] injuries (by
causing them or worsening them), then it caused those injuries."  Although this is a helpful change, the
parenthetical explanation, "by causing them or worsening them," or
similar language is not necessary for the instruction to communicate the
correct legal standard.  It also does not
change our analysis of the defendant's argument here.

[15] Notably, as
the discharge nurse, Hanlon was the last provider to see the plaintiff on both
visits.  Hanlon assessed the plaintiff
briefly before he was seen by Flores on March 13, but saw him again after
Flores when she discharged the plaintiff.

[16] In the
motion, Hanlon's counsel included the following footnote regarding prejudgment
interest:
"Nurse
Hanlon also states an order for remittitur ought to provide interest from
filing of the action to the original trial date of [June] 15, 2020.  Nurse Hanlon should not be penalized for
accumulation of interest due to reasons beyond her control; namely the shut
down of Court proceedings and delay reaching trial due to Covid-19 orders.  As well, trial in October 2022 was derailed
solely on account of Plaintiff's expert witness purported illness."

[17] We note that
front pay in an employment case can be quite uncertain and therefore presents a
distinct set of considerations applicable to the award of prejudgment
interest.  As we stated in Conway, 402
Mass. at 388-389:    
"It is
apparent that the greater the period of time upon which a front pay award is
calculated in a case involving an at-will employee the less likely it is that
the loss of future earnings can be demonstrated with any degree of certainty or
can reasonably be attributed to the illegal conduct of the employer.  Moreover, as with claims for back pay, the
employee has a duty to mitigate damages by seeking other employment."  (Footnote omitted.)
For example, an
employee discriminated against may decide to leave and successfully seek more lucrative
employment, thereby entitling the employee to back pay but not front pay for
such discrimination.